## COMMONWEALTH *vs.* RANDOLPH LEWIS.

Suffolk.   September 11, 1981. — November 6, 1981.

Present: GRANT, PERRETTA, & KASS, JJ.

*Grand Jury.  Practice, Criminal,* Grand jury proceedings, Speedy trial.
   *Identification.  Constitutional Law,* Speedy trial.  *Evidence,* Impeach-
   ment of witness.  *Witness,* Impeachment.  *Error,* Harmless.

A defendant in a criminal case was not entitled to have the indictments
   against him dismissed on the ground that newspaper publicity had
   prejudiced the grand jury against him.  [564]
The fact that all the photographs shown to a witness in a criminal case
   were of persons suspected by the police of having participated in the
   incident in question did not require the suppression of the witness's
   identification of the defendant.  [565]
A criminal defendant who had not been brought to trial within the six-
   month period contemplated by G. L. c. 277, § 72, was not entitled as
   a result to have the indictments against him dismissed.  [565-566]
A one-year delay in bringing a criminal defendant to trial did not, in the
   circumstances, deprive the defendant of his constitutional right to a
   speedy trial.  [566-569]
It was reversible error at the trial of indictments for armed assault with
   intent to murder, armed robbery, and assault and battery by means of
   a dangerous weapon to exclude questions to two witnesses for the pros-
   ecution concerning unresolved criminal charges pending against them
   where the two witnesses were the only ones who implicated the de-
   fendant in the assaults and where, even though one witness had been
   badly impeached by his extensive criminal record and his numerous in-
   consistent statements, the jury were left with the erroneous impression
   that all the charges against the second witness had been brought to
   conclusion.  [569-573]

INDICTMENTS found and returned in the Superior Court
on April 27, 1976.

The cases were tried before *McGuire, J.*

*James D. St. Clair* (*Robert D. Keefe* with him) for the
defendant.

*James M. McDonough*, Assistant District Attorney, for the Commonwealth.

GRANT, J.  During the evening of April 19, 1976, Richard Poleet stopped his car on Eustis Street in Boston for a red light at the intersection of that street and Harrison Avenue. A crowd of youths had congregated on the sidewalks surrounding the intersection for the purpose of engaging in the vicious pastime known as "playing the lights."  As the light changed and the Poleet car started forward, it was pelted with missiles thrown by members of the crowd.  A brick went through the windshield of the car, and Poleet slumped over.  His car lurched forward out of control and collided with and came to rest against another car which had entered the intersection from the opposite direction as the light changed.  Some members of the crowd surged toward the two cars.  Poleet was dragged from his car, robbed, and so severely beaten on the head that he ultimately died on May 30, 1978.

The defendant Lewis (defendant) was arrested the day after the incident and brought into the Roxbury Municipal Court.  On April 27, 1976, he was indicted for armed assault with intent to murder, armed robbery, and assault and battery by means of a dangerous weapon.  He was put to trial on those indictments in March of 1977, together with Stanley Young and Darrell Weaver, against whom there were companion indictments for the same offences. A jury convicted the defendant on all three indictments,[1] and he appealed under G. L. c. 278, §§ 33A-33G, as in effect prior to St. 1979, c. 346, §§ 1-3.[2]

---

[1] Young was acquitted on all the indictments against him. Weaver was convicted of a lesser offence included within each of the indictments against him and does not appear to have taken any appeal.  The verdicts against Weaver can be explained by the jury's refusal to find that he had been armed with a weapon during the course of the incident.

[2] The delay in processing the appeal is explained by the return of the indictments for murder which were considered in *Commonwealth* v. *Lewis*, 381 Mass. 411 (1980).

1. We consider first the defendant's motion to dismiss the indictments on the ground that "news releases and publicity tended to convince the public in general and the Grand Jury in particular, of the guilt of the defendant . . . and tended to arouse animosity, indignation and prejudice toward and against the defendant, thus making it impossible for the defendant . . . to be judged by a fair, impartial and unbiased Grand Jury." The motion was filed at the outset of the case but was referred to the trial judge for disposition. It was ultimately submitted on copies of articles which had appeared in Boston area newspapers following the incident,[3] together with a request for the issuance of summonses to the individual grand jurors so that they could be interrogated as to the possible effects of the publicity on them during the course of their deliberations. The motion and the request were denied after hearing.

There was no error for the reason, if no other, that the defendant was not entitled to be indicted by a grand jury which was free from bias or prejudice. *Commonwealth* v. *Monahan*, 349 Mass. 139, 155-156 (1965), and cases cited. See also *Beck* v. *Washington*, 369 U.S. 541, 546 (1962); *Gorin* v. *United States*, 313 F.2d 641, 645 (1st Cir. 1963), cert. denied, 379 U.S. 971 (1965); *Martin* v. *Beto*, 397 F.2d 741, 746 (5th Cir. 1968), cert. denied, 394 U.S. 906 (1969). If there were any room for doubt on this point, it would be laid to rest by the later concession by counsel for the defendant, in the course of a discussion of whether the jury should be sequestered, that "the publicity has been eminently fair." See and compare *United States* v. *Brien*, 617 F.2d 299, 313 (1st Cir.), cert. denied, 446 U.S. 919 (1980).[4]

---

[3] The defendant does not appear to have availed himself of the opportunity afforded him by the judge to submit tapes of the publicity which the electronic media gave the incident.

[4] We add our own observation that if newspaper publicity such as that which was accorded this case should require dismissal of the indictments, there would be few publicized crimes of violence which could be prosecuted promptly.

2. The defendant claims error in the denial of his pretrial motion to suppress the anticipated identification testimony of Kevin Walker and David Francis,[5] which was also heard and denied by the trial judge. There is no challenge to any of the carefully articulated subsidiary findings of fact filed by the judge or to any of his ultimate findings of fact or conclusions of law. See *Commonwealth* v. *Moon*, 380 Mass. 751, 755-756 (1980), and cases cited. The only argument of possible constitutional dimensions which has been addressed to us is based on certain evidence at the suppression hearing, which is not reflected in the judge's findings, to the effect that all the photographs shown to Francis[6] were of persons suspected by the police of having participated in the incident of April 19. The difficulty with the contention is that there was no evidence at that hearing from which it could have been inferred that the police told or suggested to Francis that any of the photographs were of suspects or that Francis so believed.

There is no constitutional dimension to any of the other arguments which were addressed to the judge or which are now addressed to us. See and compare *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. 230, 237 (1978), and cases cited.

3. The defendant was held until trial in March of 1977 with bail set at $25,000, which was the figure that had been set when he was first brought into the Municipal Court on April 20, 1976. Between that date and May 13, 1976, there were three separate bail or bail review hearings in the Superior Court and one bail review hearing before a single justice of the Supreme Judicial Court, at each of which the defendant sought without success to be released on personal recognizance. Two further requests that the defendant be so released were denied by the Superior Court on November 30 and December 12, 1976. The defendant now claims

---

[5] The motion was also addressed to the anticipated identification testimony of Tyrone Layton, but Layton did not testify at trial.

[6] There is no evidence that that array of photographs was shown to Walker. It may have been shown to Layton, but, as has already been noted, Layton did not testify at trial.

for what appears to be the first time that the indictments against him should have been dismissed because he was not brought to trial within the six-month period contemplated by G. L. c. 277, § 72, as in effect prior to St. 1979, c. 344, § 42.

Section 72 provided, with exceptions not here material, that "[w]hoever [was] held in custody upon an indictment [should], if he require[d] it, either be tried at the sitting of the court next after the expiration of six months from the time when he was imprisoned or be bailed upon his own recognizance . . . ." We think it clear from the plain language of the statute that the only relief to which a defendant was entitled if he were not tried within the six-month period was release on his own recognizance. The commonly understood remedy for a wrongful refusal of the Superior Court to grant such a release was a petition for habeas corpus brought in the single justice session of the Supreme Judicial Court.[7] So far as we have been able to ascertain, that remedy was not pursued in this case.

4. The defendant also argues that the indictments should have been dismissed for failure to grant him a speedy trial as guaranteed (a) by art. 11 of the Massachusetts Declaration of Rights and (b) by the Sixth Amendment to the United States Constitution, as expounded in *Barker* v. *Wingo*, 407 U.S. 514 (1972).

It will be remembered that the defendant was arrested on April 20, 1976. The selection of the jury commenced on March 21, 1977, well within the one-year period now required by Mass.R.Crim.P. 36(b)(1)(C), 378 Mass. 909 (1979).[8]

---

[7] Contrast the concluding paragraph of the present Mass.R.Crim. P. 36(b), 378 Mass. 910 (1979).

[8] Too many counsel who rely on *Barker* v. *Wingo* seem to overlook some of the facts in that case, in which the United States Supreme Court declined to order dismissal of an indictment despite the fact that the prosecution, for reasons of trial strategy, had purposely delayed the trial of the defendant for more than four years.

The record reveals the history of the defendant's assertion of his right to speedy trial as well as the reasons for delay. On May 7, 1976, the defendant filed a routine motion for a speedy trial. He immediately began to work at cross purposes with himself by filing in the Supreme Judicial Court on May 11 a petition, supposedly under G. L. c. 211, § 3, under which he sought to establish his right to a probable cause hearing in the Municipal Court. That petition was dismissed by a single justice on May 13. The defendant filed an appeal to the full court which he later failed to prosecute.

On June 3, 1976, the defendant secured the allowance of the motion for a speedy trial which he had filed on May 7. His counsel was advised by the judge who allowed the motion that any assignment of a trial date would have to be secured from the judge sitting in the first criminal session.[9] The defendant appeared in that session on June 14, 1976, with the request that the case be assigned for trial that month. Counsel for Young advised the judge that he would not be ready for trial until the following month. The prosecutor advised the judge that the incident of April 19 was still under investigation by the grand jury and that there might well be indictments of additional persons not then before the court.[10] The prosecutor also advised the judge of Poleet's physical condition and of his (the prosecutor's) intention to seek indictments for murder, which would supplant the pending indictments, if Poleet should die. The judge advised all present that all the criminal sessions scheduled for July and August were blocked by older cases which had been specially assigned for trial. He set September 13, 1976, as the date for trial of the present case.

---

[9] It does not appear that the judge who allowed the motion was advised of the appeal pending in the Supreme Judicial Court.

[10] It appears beyond dispute that the grand jury continued its investigation until at least September 7, 1976. At the end of August of that year the grand jury returned an indictment against Linnell Young, the brother of the codefendant Stanley Young. Linnell could not be found to be arrested and was still among the missing at the time of trial.

At least one of the other counsel involved in this case (it is not clear who) was unavailable on September 13.[11] Not long thereafter counsel for the defendant became ensnared in a lengthy criminal trial which was not concluded until December 23, 1976.[12] It was not until December 17 that the prosecutor and an associate of counsel for the defendant were able to file a written stipulation concerning the pretrial discovery which had previously been ordered by the court and to submit to it their remaining disputes on that subject.

On December 17 there was further consideration of a possible trial date. Associate counsel for the defendant requested January 17, 1976. That request had to be and was denied: because counsel for Weaver had been specially assigned for trial in the United States District Court on that date and to try a murder case in the Superior Court on January 24; because the prosecutor and counsel for Young were paired off against each other in two separate murder cases which had been assigned for trial on January 5 and 26; and because counsel for Young had been assigned for trial in yet another murder case which was set for February 10. The judge set a trial date of March 14, 1977. On January 4, 1977, counsel for the defendant filed a motion for an immediate trial or, in the alternative, to dismiss the indictments. That motion was denied in its entirety, for the same reasons the judge had given on December 17.

As late as January 20 and March 14, 1977, the defendant was filing and pursuing (without success) motions to compel further discovery or, in the alternative, to dismiss the in-

---

[11] The same judge sat in the first criminal session throughout all the proceedings material to the speedy trial question. On December 17, 1976, he remarked that "the court has had . . . sessions available for trial on prior dates when there have been conflicts of defense counsel as well as the assistant district attorney."

[12] It is not clear just when that trial commenced. The defendant tells us in his brief that the trial began on November 29. On January 4, 1977, counsel for the defendant told the judge in the first session that the trial had taken ten weeks.

dictments for the prosecution's alleged failure to make discovery.[13] Hearings commenced on March 14, 1977, on the various pretrial motions which had been referred to the trial judge. As already stated, the trial commenced a week later.

The only specific suggestion of possible prejudice to the defendant arising from the delay in bringing him to trial which has been put to us is faint, especially when considered in light of the facts that on two different occasions (June 14 and December 17, 1976) either counsel or associate counsel for the defendant advised the court that they would have no objection to a continuance if the defendant were to be released on his own recognizance. The defendant points to the testimony of the driver of the car which was struck by the Poleet car, who volunteered as the reason for his inability to describe the clothing worn by Poleet's assailants that "It's been so long, I really can't remember." We find the suggestion unpersuasive, especially as the witness in question never identified any of the assailants.

We have weighed and balanced all the factors set out in *Barker* v. *Wingo*, 407 U.S. at 530, and have concluded that the defendant was not deprived of his Sixth Amendment right to a speedy trial. It has not been argued that any different conclusion is required by art. 11 of the Declaration of Rights.

5. Two of the principal witnesses for the prosecution, the only ones who implicated the defendant in the assaults, were Kevin Walker and David Francis. Walker, who was a juvenile, testified on direct examination that the defendant had stepped between the two cars after the collision,[14] had reached inside the open window on the driver's side of Poleet's car and struck him on the head with a brick, and had then gone around to the passenger side of that car, where he then proceeded to pull Poleet halfway out of the

---

[13] The point raised by those motions has been abandoned on appeal.

[14] Whether the two cars had come to rest at such an angle with respect to each other as to permit anyone to get between them was one of the hotly contested issues at trial.

car, take his wallet, and hit him again with a brick. At the outset of Walker's cross examination counsel for the defendant asked him whether he was then under arrest (which counsel knew to be the fact); the question was excluded on objection by the prosecutor. Counsel then brought out that the witness had been adjudicated a delinquent by reason of his participation in the Poleet incident; that he had a record of other adjudications of delinquency by reason of his commission of other offences; and that the prosecution had promised him that if he would cooperate with the police in this case, it would use its best efforts to keep his involvement in the case in the juvenile system. Counsel then drew concessions from Walker that he had lied to the judge at the suppression hearing as to how close he had been standing to the Poleet car at the time of the incident and as to how many people had been standing between him and the car at that time.

A conference was then had at the bench at which counsel reminded the judge of the ruling by which he had excluded the question as to whether Walker was under arrest and advised the judge of his desire to ask the witness "whether . . . he is currently under arrest, whether he is awaiting trial or disposition on the issue of showing his bias, showing a desire on his part to please the government as an explanation of his complete recanting of testimony" at the suppression hearing. The prosecutor confirmed that Walker had been arrested on a charge of breaking and entering which had not been disposed of but objected to the proposed questions on the ground that he had not offered the witness any promise or inducement in connection with the breaking and entering. Counsel for the defendant responded: "I don't need to know the nature of the charges, just that he is charged with a crime. I am not asserting the government has made any promises. I am simply asserting that I should be allowed to show that he is currently in custody on the issue of bias as to

why he has changed his testimony." The judge announced that he would adhere to his earlier exclusionary ruling.[15]

Francis, an adult, testified on direct examination that he was presently incarcerated with bail set at $10,000 in connection with charges against him arising from the Poleet incident; that the defendant had reached into the driver's side of Poleet's car and struck him on the head two or three times with a brick; and that Weaver had pulled Poleet from the passenger side of the car, after which the defendant had hit and kicked Poleet and taken his wallet. It was stipulated that the prosecution had promised Francis that it would recommend $1,000 cash bail or a $10,000 bond if he would cooperate with the prosecution in this case. Counsel for the defendant brought out on cross examination that the witness had not yet been brought to trial for his participation in the Poleet incident, drew from him a concession that he "hope[d] things would go lighter with [him]" for his having admitted to his participation in the incident, and introduced in evidence the records of eighteen adjudications of delinquency or adult convictions of the witness. Counsel also drew from the witness concessions that he had previously told the prosecutor, the police and the grand jury that the defendant had not been involved in the incident. Counsel for Young brought out the fact that the witness had also lied to the grand jury concerning whether Young's brother had participated in the incident.

There followed a bench conference at which counsel for Weaver advised the judge (without contradiction by the prosecutor) that there were eight undisposed of indictments pending against Francis and gave notice of his intention to cross examine the witness concerning the indictments "with reference to this witness's prejudice and interest in the outcome of his testimony and his desire to cooperate with the

---

[15] The judge did qualify his ruling with the words "[a]t this time." In view of the way matters subsequently developed with the testimony of the witness Francis, we think it would have been futile for the defendant to attempt to renew this line of questioning with Walker.

government." The judge deferred any ruling and required the filing of a motion which would raise the question. Counsel for the defendant was later given permission to file a similar motion and did so. His motion, which is set out in the margin,[16] was denied after hearing.[17]

We think it too clear for discussion that the judge erred in excluding the proposed questions to Walker and Francis concerning the pending charges against them. *Commonwealth v. Ferrara*, 368 Mass. 182, 186-190 (1975). *Commonwealth v. Martinez*, 384 Mass. 377, 379-381 (1981). *Commonwealth v. Hogan*, 7 Mass. App. Ct. 236, 240-242, S.C., 379 Mass. 190, 192 (1979) ("If, due to pending criminal charges, the possibility of witness bias is present, even if it is an unlikely one, a defendant is entitled to inquire on the subject"). Contrast *Commonwealth v. Cheek*, 374 Mass. 613, 614-615 (1978); *Commonwealth v. Santos*, 376 Mass. 920, 925-926 (1978); *Commonwealth v. Haywood*, 377 Mass. 755, 761-763 (1979). The question remains whether the defendant is entitled to a new trial by reason of either or both of the errors.

Only a jury who had succumed to somnolence would have failed to appreciate that Francis had been badly impeached by his extensive criminal record and his numerous prior inconsistent statements or would have missed the significance of the witness's admitted bias for the prosecution stemming from the unresolved charges concerning the Poleet

---

[16] "The defendant, Randolph Lewis, by his attorneys, moves this Honorable Court to allow his counsel to examine the Commonwealth's witness, David Francis, concerning the issue of bias, prejudice, and interest in the outcome of the case, by questioning Mr. Francis on all pending Superior Court indictments and complaints other than the indictments arising out of the assault and robbery of Richard Poleet on April 19, 1976."

[17] Somewhat later, in the course of a colloquy over a question the prosecutor had put to Francis as to why he had changed his previous story concerning the defendant's lack of participation in the incident, the judge indicated his willingness to review his earlier ruling if the prosecutor should press his question. The prosecutor thereupon withdrew his question, and there was no further occasion for review of the ruling.

incident. The record in this case discloses a conscientious jury who requested further instructions on three separate occasions during the course of deliberations which extended over four days.[18] It also discloses a discriminating jury who acquitted Young of all the charges against him and found that Weaver had not been armed and so convicted him of lesser included offences.[19] If the only error confronting us were the one concerning Francis, we might not feel obliged to reverse. The greater difficulty comes with the error concerning the Walker testimony. Here was a young witness who had obviously learned the value of cooperating with the prosecution in order to avoid being treated as an adult with full responsibility for his criminal acts and who might well entertain the hope that a little extra cooperation on his part would result in his being kept in the juvenile system again with respect to the pending charge of breaking and entering. A conscientious and discriminating jury were left with the erroneous impression that all the charges which had ever been leveled against Walker had been brought to conclusion.

"We recognize . . . that the evidence might not have been helpful to the defendant . . ., but the essential consideration is that it was for the jury to hear and evaluate it." *Commonwealth* v. *Franklin,* 366 Mass. 284, 290 (1974). Upon consideration of the whole case, we conclude that the defendant must have a new trial on all three indictments.[20]

6. Other questions are considered in the appendix to this opinion.

*Judgments reversed.*
*Verdicts set aside.*

---

[18] One of the questions asked was: "Your Honor: The jurors would like you to clarify the statement you made during your charge regarding the reliability of witnesses with previous criminal records, more especially in regard to their credibility."

[19] See note 1, *supra*.

[20] We think it would ordinarily be helpful for the jurors to know the nature of the unresolved charges pending against a witness so that they will have some means of gauging the extent to which the witness may be biased. Much must be left to the discretion of the trial judge in this area; if the jurors are advised of the nature of the charges, they should be instructed as to the limited purpose for which the evidence may be considered.

APPENDIX.

6(*a*).  There was no error in excluding the questions to Officer Mont-gomery which called for the hearsay declarations of persons the officer had interviewed in the course of his investigation.  It did not appear that any of the declarants was unavailable, and no effort was made to demonstrate the trustworthiness of any of the declarations.  See *Common-wealth* v. *Carr*, 373 Mass. 617, 622-625 (1977); *Commonwealth* v. *Keizer*, 377 Mass. 264, 268-271 (1929); *Commonwealth* v. *Stewart*, 383 Mass. 253, 258 (1981).

6(*b*).  There was nothing in the ruling by which the judge forbade Walker to read aloud his testimony before the grand jury which prevented counsel from asking Walker whether he had made prior inconsistent statements before that body or from proving what such statements were.

6(*c*).  A mistrial was not required by reason of the manner in which the judge dealt with Layton's refusals to be sworn as a witness, particular-ly in view of the fact that Layton had testified at the suppression hearing without attempting to assert any privilege and in view of the flawless cau-tionary instructions which the judge gave the jury.  See and compare *Commonwealth* v. *Martino*, 361 Mass. 720, 721-722 (1972); *Common-wealth* v. *Martin*, 372 Mass. 412, 418-422 (1977); *Commonwealth* v. *Fazio*, 375 Mass. 451, 458-462 (1978).  See generally Flanagan, Conduct of the Prosecutor 22-24 (1979).  To avoid any question at any further trial, it would be preferable to deal with any similar problem out of the presence of the jury.

6(*d*).  The judge could not properly have struck all the Francis testi-mony on the ground that it was incredible as a matter of law.  *Common-wealth* v. *Binkiewicz*, 339 Mass. 590, 591 (1959).  Compare *Common-wealth* v. *Gould*, 380 Mass. 672, 679 (1980).

6(*e*).  Before giving any instructions on joint enterprise at any further trial the judge should consider carefully whether the evidence is sufficient to warrant a finding of such an enterprise and whether the case has been tried and argued on that theory.