COMMONWEALTH vs. JOHN W. McLEOD
(and thirteen companion cases[1]).

Suffolk.  February 5, 1985. — May 8, 1985.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide.  Grand Jury.  Practice, Criminal,* Grand jury proceeding, Instructions to jury, Argument by prosecutor, Voir dire, Disclosure of evidence. *Proximate Cause.*

At a criminal trial, the judge was not required to conduct an inquiry to determine whether the grand jury that indicted the defendants had been prejudiced by preindictment publicity, where the defendants made no prima facie showing of bias or prejudice so egregious as to result in indictments based on animosity on the part of the grand jury toward the defendants, within the meaning of G. L. c. 277, § 5. [732-735]

The judge at a murder trial correctly instructed the jury that proximate cause is "a cause, which, in the natural and continuous sequence, produces the death, and without which the death would not have occurred." [735-736]

At the trial of murder charges arising from an altercation between the defendant police officers and a group of civilians, there was sufficient evidence to warrant the prosecutor's comments in closing argument to the jury to the effect that the defendants entered a certain motel room for the purpose of punishing individuals who had attacked one of their number, rather than for making lawful arrests. [736-737]

At a murder trial, the judge's instructions to the jury as to manslaughter, if warranted by the evidence, did not improperly shift the burden of proof to the defendant on the issue of adequacy of provocation, and presented no substantial risk of a miscarriage of justice. [737-740]

Where defense counsel at a criminal trial had sufficient opportunity on cross-examination to explore the reasons that certain Commonwealth witnesses testified to a version of the events differing from that given by them in pretrial proceedings and interviews, the judge was not required to allow a voir dire of the witnesses as to circumstances leading to their changes. [740-743]

---

[1] Of the companion cases, two are against John W. McLeod, six are against Richard P. Aiello, and five are against John T. Macauda.

The circumstances in which certain witnesses at a criminal trial testified to
a version of the events differing from that given by them on earlier
occasions gave no support to the defendants' contentions that the Com-
monwealth violated the rule in *Brady* v. *Maryland,* 373 U.S. 83 (1963),
by not providing the defense with notice of anticipated change in tes-
timony, or that the Commonwealth presented evidence it knew or should
have known to be false. [743-744]

At a murder trial the judge's instructions to the jury adequately covered
issues concerning the existence of an independent, intervening cause of
the victim's death. [744-745]

At the trial of charges arising from an altercation between the defendant
police officers and a group of civilians, after which one civilian died of
injuries he received during the incident, the evidence as to one of the
defendants, including expert testimony which would have been insuffi-
cient standing alone, and eyewitness testimony as to how the defendant
struck the victim, the type of weapons allegedly used, and the condition
of the victim after the attack, was sufficient to warrant the jury in finding
that defendant guilty of manslaughter either on the basis that his blows
alone, or the blows of all the defendants together, caused the victim's
death. [745-748]

INDICTMENTS found and returned in the Superior Court De-
partment on August 25, 1982.

The cases were tried before *Robert A. Barton, J.*

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Gerald Alch* for Richard P. Aiello.

*Frank J. McGee, Jr.* (*Steven M. Guiney* with him) for John
W. McLeod.

*Anthony M. Cardinale* for John T. Macauda.

*Daniel C. Mullane,* Assistant District Attorney (*David B.
Mark,* Assistant District Attorney, with him) for the Common-
wealth.

LYNCH, J.   In the early hours of July 23, 1982, an altercation
took place at the King Arthur's Motel in Chelsea between
police officers from Everett and Chelsea and a group of civil-
ians. One civilian, Vincent J. Bordonaro, died of injuries he
received during that incident. At a trial of several police officers
for murder in the first degree, a jury found John W. McLeod
and Richard P. Aiello guilty of murder in the second degree

and John T. Macauda guilty of manslaughter. The defendants were also found guilty on several other indictments, including assault and battery, assault and battery by means of dangerous weapons, and civil rights violations.[2] They now challenge their convictions on several grounds. We transferred their appeals to this court on our own motion, and we affirm the judgments of conviction.[3]

The defendants join in arguing three reasons their convictions should be reversed. First, they argue that the judge abused his discretion by failing to conduct an inquiry into the possibility of prejudice during the grand jury proceedings, engendered by extensive preindictment publicity. Second, they contend that the judge's instruction to the jury on causation was incorrect. Third, they maintain that the judge should have ordered a mistrial because of alleged improprieties in the Commonwealth's closing argument. McLeod and Aiello also contend that the judge's manslaughter instruction impermissibly shifted to the defendants the burden of proving mitigating circumstances. Macauda individually poses three additional chal-

---

[2] McLeod was also convicted of assault and battery by means of a dangerous weapon, and on two counts of an indictment charging assault and battery. Aiello was also convicted on three indictments charging assault and battery by means of a dangerous weapon and of two civil rights violations. Macauda was also convicted of the lesser included offense of assault and battery by means of a dangerous weapon on Bordonaro, as well as on another indictment charging assault and battery by means of a dangerous weapon and on two indictments charging civil rights violations.

[3] McLeod was sentenced to life imprisonment for the murder conviction, and to a consecutive term of from two and one-half years to three years for assault and battery by means of a dangerous weapon. The two convictions of assault and battery were placed on file.

Aiello was sentenced to life imprisonment on the murder conviction, as well as to one concurrent term of from eight to ten years and four concurrent terms of from five to seven years on the convictions of assault and battery by means of a dangerous weapon and civil rights violations.

Macauda was sentenced to imprisonment for from six to ten years for manslaughter as well as to three concurrent terms of from five to seven years on the convictions of assault and battery by means of a dangerous weapon and civil rights violations. One conviction of assault and battery by means of a dangerous weapon was placed on file.

lenges. First, he claims that the judge should have allowed him to conduct a voir dire examination of witnesses who changed portions of their testimony at trial or should have allowed his motion for a mistrial on this ground. Second, he contends that the judge should have given a requested instruction on intervening, independent cause. Finally, he argues that there was insufficient evidence proving that his actions were a proximate cause of Bordonaro's death, and that therefore his motion for a required finding of not guilty at the close of the Commonwealth's case should have been granted. We reject each of these arguments and affirm the judgments of the Superior Court.

There was evidence from which the jury could have found the following facts. At approximately 11:30 P.M. on July 22, 1982, McLeod, an off-duty Everett police officer, arrived at the Village Pub, a Chelsea bar, where he consumed four alcoholic drinks. When the Village Pub closed, McLeod and others went to the "men's bar," a room on the first floor of King Arthur's Motel in Chelsea where alcohol was served after legal closing hours. McLeod arrived at King Arthur's at approximately 1:45 A.M., and consumed two or three more drinks. Between 3 A.M. and 4 A.M., a fight erupted between McLeod and several other patrons at the bar, including Alfred Mattuchio, Charles Cella, Charles Dimino, and Anthony Dimino. McLeod was badly beaten and thrown out of the bar, but he was able to reach a guard booth outside a nearby building, where he instructed the guard to telephone the Everett police.

Officers Aiello and Macauda responded to the call, picked up McLeod, and Aiello radioed the Chelsea and Everett police for assistance. They then drove the short distance to King Arthur's, where they were subsequently joined by about ten other Everett and Chelsea police officers. Seeing Mattuchio in the front doorway, the officers approached and announced that he was under arrest, but Mattuchio retreated inside the building and locked the door. The manager of King Arthur's, Anthony Dimino, then directed the persons still in the bar to go to room 209 on the second floor of the motel. Earlier, Helen Bozzi had helped Bordonaro, who was drunk, to room 209.

The occupants of the room locked the door and barricaded it with furniture. After initially entering the building by a fire escape, the police informed the room's occupants that they were under arrest, and ordered them to open the door. The police also directed a variety of threats to those inside the room. When the door was not opened, the police began breaking it down.[4]

After ten to twenty minutes, the police managed to break down the door, using nightsticks, a tire iron, and an axe.[5] Several officers, including Aiello and Macauda then made the "first entry" into the room, and a general melee ensued. During the first entry, Aiello and Macauda each struck several persons with heavy, blunt instruments (e.g., nightsticks, tire irons, baseball bats, axe handles, nunchaku).[6] Helen Bozzi testified that Macauda struck Bordonaro, who was lying on the bed, with a tire iron. Charles Cella saw Macauda hit Bordonaro with nunchaku or a black, hooked instrument. Charles Tardivo testified that Aiello hit Bordonaro at least twice and that Macauda delivered "three solid whacks on the head" to Bordonaro with a nightstick.

---

[4] McLeod was convicted of assaulting Arthur Guttadauro, the owner of King Arthur's, when Guttadauro attempted to intervene. Anthony Dimino, among those who allegedly assaulted McLeod, claimed that he was beaten by McLeod and Aiello in the hallway outside room 209, but was not then arrested. A witness later testified that Dimino, who suffered fractures to both legs, crawled to a nearby building and asked the witness to hide him.

[5] One officer made a futile attempt to shoot open the door. An Everett sergeant was heard to say that he wanted no part of any shooting and he left the scene.

[6] Charles Dimino testified that Aiello broke a chair over his back and hit him at least fifteen times with a club. For these acts, Aiello was convicted of assault and battery by means of a dangerous weapon and of violating Dimino's civil rights. Charles Cella claimed that he was hit several times with a club or baseball bat by Aiello. For these acts, Aiello was convicted of assault and battery by means of a dangerous weapon and of violating Cella's civil rights. Mattuchio alleged that Aiello beat him with a nightstick. For these acts, Aiello was convicted of assault and battery by means of a dangerous weapon. Charles Tardivo stated that Macauda struck him on the head with a nightstick. For this act, Macauda was convicted of assault and battery by means of a dangerous weapon and of violating Tardivo's civil rights.

At some point, the police left the room and Macauda returned to his cruiser. Bordonaro was by this time unconscious. Aiello was seen carrying a baseball bat while walking down the hall to McLeod, who had not participated in the first entry.[7] After McLeod and Aiello walked back to the room, McLeod took the bat from Aiello.[8] During this "second entry," McLeod struck both Bordonaro and Mattuchio.[9] With each of the several hits, witnesses reported that McLeod yelled, "My name is John McLeod and don't you forget it." Bordonaro was hit several times and he rolled off the bed onto the floor. Shortly after the incident, he regained consciousness for a brief time, but he later became unconscious and died at a hospital on July 30, 1982.

1. *Grand jury prejudice*. The defendants argue that the judge should have conducted an inquiry to determine whether the grand jury were prejudiced by preindictment publicity. The defendants claim that they made a prima facie showing of prejudice, and urge us to modify the rule that bias or prejudice is no basis for challenging indictments returned by a grand jury. See *Commonwealth* v. *Monahan*, 349 Mass. 139, 156 (1965). They contend that the judge should have inquired further or dismissed the indictments. We disagree.

First we reject the defendants' arguments that the Fifth and Fourteenth Amendments to the United States Constitution require that indictments be returned only by an unprejudiced grand jury. It is true that such a requirement has been imposed in Federal grand jury proceedings. See *United States* v. *Hyder*, 732 F.2d 841, 842 (11th Cir. 1984); *United States* v. *Burke*, 700 F.2d 70, 82 (2d Cir.), cert. denied, 464 U.S. 816 (1983). Nevertheless, the Supreme Court has refused to "remotely intimate any view" on whether this requirement is applicable

---

[7] McLeod apparently lost consciousness at some point, but repeatedly refused the advice of fellow officers and an ambulance attendant to seek treatment for his injuries until after the "second entry" had occurred.

[8] Some witnesses recalled Aiello handing the bat to McLeod and stating, "John, finish them off."

[9] McLeod was convicted of assault and battery by means of a dangerous weapon on Mattuchio.

to State grand jury proceedings (*Beck* v. *Washington,* 369 U.S. 541, 546 [1962]), and this court has not applied it to our own grand juries. *Commonwealth* v. *Monahan, supra.*

Moreover, we see no reason to create such a rule in this Commonwealth. This court has long recognized that "[t]he grand jury is an investigatory and accusatory body only. It cannot and does not determine guilt." *Brunson* v. *Commonwealth,* 369 Mass. 106, 120 (1975). See *Commonwealth* v. *Woodward,* 157 Mass. 516, 517 (1893). Because of the historical and practical nature of the grand jury, and the availability of an unprejudiced petit jury at trial, the safeguards deemed necessary to protect an accused before a petit jury are not implicated to the same degree in grand jury proceedings. Thus, this court has held that, unlike petit jurors, grand jurors may act on their own personal knowledge and need not be free from all bias or prejudice. *Commonwealth* v. *Monahan, supra* at 155-156. *Commonwealth* v. *Woodward, supra* at 518-519. See *Commonwealth* v. *Lewis,* 12 Mass. App. Ct. 562, 564 (1981).

In addition, however, the grand jury perform the important task of determining whether there is probable cause to indict an accused. *Commonwealth* v. *O'Dell,* 392 Mass. 445, 450 (1984). In this way, the grand jury act as a shield against unfounded criminal prosecutions. See *Commonwealth* v. *McCarthy,* 385 Mass. 160, 163 (1982); *Lataille* v. *District Court of E. Hampden,* 366 Mass. 525, 532 (1974); *Branzburg* v. *Hayes,* 408 U.S. 665, 668 (1972), aff'g *Matter of Pappas,* 358 Mass. 604, 613-614 (1971). This court has already held that where the integrity of the grand jury process is seriously impaired, dismissal of an indictment may be appropriate. See *Commonwealth* v. *O'Dell,* 392 Mass. 445, 447 (1984) ("unfair and misleading presentation" of evidence): *Commonwealth* v. *Salman,* 387 Mass. 160, 166 (1982) (use of "knowingly false testimony"). See also *Commonwealth* v. *St. Pierre,* 377 Mass. 650, 656 (1979) (excessive reliance on hearsay). It is clear that a grand jury must act in a matter consistent with their oath.[10]

---

[10] The grand jurors' oath is set forth in G. L. c. 277, § 5: "You, as grand jurors of this inquest for the body of this county of    , do solemnly swear

*Commonwealth* v. *Geagan,* 339 Mass. 487, 497-498, cert. denied, 361 U.S. 895 (1959), and cases cited. It is equally true that further inquiry may be warranted where a defendant makes a prima facie showing of bias or prejudice so egregious as to result in an indictment based on "hatred or malice," within the meaning of G. L. c. 277, § 5.

The defendants have failed to make such a showing here. Although they rely on three elements to do so, none of these factors, taken individually or in combination, meets their burden. First, the defendants introduced copies of newspaper articles as well as recordings of television and radio programs to show pervasive media coverage of the incident. But as we have stated, the fact that grand jurors may have some familiarity with an alleged crime, bring this information into the grand jury room, and act on it, is not sufficient to require either further inquiry into alleged prejudice or the automatic dismissal of an indictment. Simply stated, the exhibits of media coverage do nothing to establish animosity on the part of the grand jury toward the defendants. Second, the judge's findings in his decision to allow a change of venue for trial before a petit jury because of pretrial publicity are irrelevant to the grand jury for the same reason.[11]

Third, the defendants contend that certain actions by individual members of the grand jury illustrate their hostility, at least toward Macauda. The judge found that one grand juror said to Macauda, "[Y]ou think we are idiots, we don't understand." The judge was fully warranted in concluding that this grand juror's attitude "could well have been the result of listening to 9 days of testimony and 28 prior witnesses," many of whom gave substantially different versions of events. The

that you will diligently inquire, and true presentment make, of all such matters and things as shall be given you in charge; the commonwealth's counsel, your fellows' and your own, you shall keep secret; *you shall present no man for envy, hatred or malice,* neither shall you leave any man unpresented for love, fear, favor, affection or hope of reward; but you shall present things truly, as they come to your knowledge, according to the best of your understanding; so help you God" (emphasis added).

[11] We note that none of this extensive, preindictment publicity was caused by the Commonwealth.

defendants also allege that, during Macauda's testimony, one grand juror characterized the incident as a "massacre." Since a prior witness had already used the term, we agree that such a statement would not be persuasive evidence of malice held as the result of extensive, adverse publicity. Finally, we reject the defendants' challenge to the judge's finding that because not all of the officers indicted were indicted for the same offenses, it was apparent "that the grand jurors carefully deliberated and acted on the basis of the evidence presented, rather than as a result of bias induced by publicity." The defendants' contention that prejudice is shown because only Everett police officers were indicted for Bordonaro's death is without merit. Each defendant was indicted for a series of different crimes committed against a different array of victims, and each indictment was supported by a rational view of the evidence.

2. *Proximate cause instruction.* The defendants argue that the judge's proximate cause instruction failed to apprise the jury properly of that concept, and instead confused proximate cause with actual cause. Since none of the defendants objected to this instruction, we need only consider whether it created a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Sheline,* 391 Mass. 279, 291-292 (1984). Since we conclude that the instruction was correct, there is no risk of a miscarriage of justice.

Actual cause encompasses "[a]ll antecedents which contribute to a given result," no matter how tenuous the connection. Perkins, Criminal Law 687 (2d ed. 1969). "Proximate cause" defines a point beyond which the law will not recognize a contributing factor as a cause giving rise to liability. "The term 'proximate' is used in contrast to the term 'remote.'" J. R. Nolan, Criminal Law § 122, at 51 (1976). Thus, in *Commonwealth* v. *Rhoades,* 379 Mass. 810, 824-825 (1980), this court found fault with an instruction that left "the jury with the impression that if [a defendant's] act . . . in any way constituted a link, no matter how remote, in the chain of events leading to . . . death, [a defendant] should be convicted."

In *Rhoades,* however, the court approved an instruction that defined proximate cause as "a cause, which, in the natural and

continuous sequence, produces the death, and without which the death would not have occurred." *Id.* at 825, quoting California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979). In this case, the judge used those very words to instruct the jury. The defendants have not suggested a more appropriate instruction, and we see no reason to change the view expressed in *Rhoades* that the instruction as given adequately expresses the notion of proximate cause.

3. *Closing argument.* The defendants contend that the judge should have granted a mistrial based on two statements allegedly made without evidentiary basis during the prosecutor's closing argument. See *Commonwealth* v. *Smith,* 387 Mass. 900, 910 (1983) ("pure speculation [and] . . . contrary to the evidence"). We hold that the prosecutor's comments constituted fair argument. Cf. *Commonwealth* v. *Howell, ante* 654, 661-662 (1985).

The defendants object to the prosecutor's statements which suggested that the defendants in the first entry struck Bordonaro because they mistakenly believed that he was Mattuchio.[12] The jury could have drawn such an inference. There was evidence that McLeod had told other officers that Mattuchio had been one of his assailants, that the police knew Mattuchio to be in room 209, that when the first entry was made he was initially hidden in the bathroom, that the assault on Bordonaro in the first entry was made before Mattuchio was discovered, and that Bordonaro had a general physical appearance similar to Mattuchio's.

The defendants also challenge the prosecutor's suggestions that the jury could infer from the failure to arrest Anthony Dimino

---

[12] The prosecutor stated: "You have Charlie Tardivo saying to you as he testifies, 'They seemed to focus on Bordonaro. I don't know why. They seemed to focus on him.' I'd like to suggest to you why. I'd like to suggest to you that at that point, before the bathroom door is open, the only person they have who is the size, age, weight, general description of Da Mattuchio, who they're after, is Vincent Bordonaro. You have a picture of Vincent Bordonaro in life. That's Exhibit 16. You've seen Da Mattuchio, sitting on the stand. I suggest to you that you could put all that together and the fair inference you can draw is, they thought they found the man they were after, so they went to work on him."

that the police had no legitimate purpose in mind when they entered room 209.[13] They contend that, at the time, there was no evidence that McLeod had identified any of his assailants other than Mattuchio. But McLeod himself testified that he said to Anthony Dimino, "What the f___ did you do this to me for?" McLeod thus admitted that in the presence of Aiello and Macauda he accused Anthony Dimino of being one of his assailants. The jury could have believed that Dimino was in the hallway outside room 209 before that room had been entered, that he was identified by McLeod as one of his assailants, and that he was beaten by McLeod and other officers, but was not arrested. See note 4, *supra.* Thus, it could be inferred that the officers were there to punish McLeod's assailants rather than to make lawful arrests. "[C]ounsel may argue as to the evidence and the fair inferences from the evidence." *Commonwealth* v. *Earltop,* 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). The prosecutor did no more here.

4. *Manslaughter instruction.* McLeod and Aiello argue that the judge's instruction to the jury on manslaughter improperly shifted to the defendants the burden of proving adequate provocation.[14] Since the defendants failed to object to the instruction at trial, we consider only whether it created a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Pickles,* 393 Mass. 775, 776 (1985). We conclude that the

---

[13] The prosecutor stated: "They will tell you, they were trying to get those people, however many there are, out of the room. And Officer Aiello, I suggest he has no intention other than to get into that room and make an arrest. Along comes Tony Dimino. He's the manager. What happens to Tony Dimino? Aiello and Macauda grab him. They put him up against a wall. McLeod comes over and has some conversation with him. It's clear that there's conversation, according to the various parties, about, 'Letting them do this to me,' and 'You did this to me,' and so forth. Do Officers Aiello and Macauda arrest Tony Dimino? They didn't even make arrest, just to make lawful arrests. Put handcuffs on, call a wagon, take them away? Isn't he one of the people they're looking for? Isn't he one of the four? Isn't that what you've been told by McLeod? The two Diminos, Mattuchio and Cella? But nobody arrests them."

[14] This discussion applies to Aiello, since the only basis for a manslaughter verdict against him would be premised on his joint venture with McLeod in the second entry.

instructions, taken as a whole (see *Commonwealth* v. *Albert,* 391 Mass. 853, 857-859 [1984]), adequately set forth the law. Therefore, there is no risk of a miscarriage of justice.

Manslaughter has been defined as a killing committed in "a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Hicks,* 356 Mass. 442, 445 (1969), quoting *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). In order to prove murder, it is the Commonwealth's burden to prove beyond a reasonable doubt that the defendant acted with malice, and that he acted without reasonable provocation, or in the absence of sudden heat of blood or passion, or that there is no causal connection between the provocation, the passion, and the acts committed by the defendant. Otherwise, the crime is manslaughter. *Commonwealth* v. *Stokes,* 374 Mass. 583, 592 (1978). See Perkins, Criminal Law 54 (2d ed. 1969). An instruction on manslaughter is warranted if there is some evidence, considered in the light most favorable to a defendant (*Commonwealth* v. *Harrington,* 379 Mass. 446, 450 [1980]), supporting a theory that the elements of manslaughter were present. *Commonwealth* v. *Walden,* 380 Mass. 724, 726 (1980). *Commonwealth* v. *Johnson,* 379 Mass. 177, 180 (1979). The evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have "cooled off" by the time of the homicide, and that in fact a defendant was provoked and did not cool off. See *Commonwealth* v. *Walden, supra* at 728; *Commonwealth* v. *Rooney,* 365 Mass. 484, 494-495 (1974), and cases cited.

The Commonwealth argues that "sufficient time had elapsed between the provocation and the killing for passions to have cooled [so that] the crime was murder and not manslaughter." *Commonwealth* v. *Stokes, supra* at 592 n.6. The facts of this case do show a significantly longer cooling off period than is usually the situation in manslaughter cases. Here, McLeod had at least fifteen minutes, and more likely one-half hour between

the time he was beaten and the time he struck Bordonaro. Compare *Commonwealth* v. *Richards,* 384 Mass. 396, 398 (1981) (manslaughter instruction warranted where victim shot by defendant during a fight), with *Commonwealth* v. *Coleman,* 366 Mass. 705, 707-708 (1975) (manslaughter instruction not warranted where defendant, after being punched, left the room and shot victim several minutes later). Nevertheless, it also appears that the provocation in this case was substantially greater than in many other cases. McLeod was described as having been severely beaten and he lost consciousness at least once. Compare *Commonwealth* v. *Bertrand,* 385 Mass. 356, 358, 363 (1982) (victim raised his hand to strike defendant); *Commonwealth* v. *Burke,* 376 Mass. 539, 542-543 (1978) (defendant's affections rejected by female friend). We assume, without deciding, that a manslaughter instruction was required on these facts.[15]

The defendants take issue with the judge's failure to restate the Commonwealth's burden of proof beyond a reasonable doubt during his discussion of provocation and heat of passion. "Although the judge would have followed the better practice if he had restated the Commonwealth's burden, 'the law does not require repetition of the same thought at each turn.'" *Commonwealth* v. *Doucette,* 391 Mass. 443, 452 (1984), quoting *Commonwealth* v. *Peters,* 372 Mass. 319, 324 (1977). In this case, the judge repeatedly instructed the jury that the Commonwealth had the burden of proving beyond a reasonable doubt every essential element of the crimes charged, and he did so immediately following his manslaughter instruction. As we have recently reiterated, "[a] jury charge will be upheld if it 'clearly placed the burden of proving malice beyond a reason-

---

[15] Whether McLeod mistook Bordonaro for Mattuchio would not affect whether his actions constituted murder or manslaughter. "Such a person is guilty or innocent [of manslaughter or murder] exactly as [if] the fatal act had caused the death of his adversary." *State* v. *Wynn,* 278 N.C. 513, 519 (1971). See *People* v. *Ortiz,* 320 Ill. 205, 211 (1926); *State* v. *Stallings,* 326 Mo. 1037, 1045 (1930); *Commonwealth* v. *DeMatteo,* 328 Pa. 359, 361 (1938); *State* v. *Gandy,* 324 S.E.2d 65, 67 (S.C. 1984). Although the defendants deny that such a mistake occurred, the Commonwealth argued that theory in an effort to establish a motive for the killing of Bordonaro.

able doubt on the Commonwealth and contained other discussion which, although not referring to the burden of proof as to . . . reasonable provocation, adequately defined [that factor] and established [it] as negating a finding of malice.'"[16] *Commonwealth* v. *Nieves, ante* 355, 360 (1985), quoting *Commonwealth* v. *Stokes, supra* at 591. *Commonwealth* v. *Doucette, supra* at 452-453. The instruction was therefore constitutionally sufficient and no substantial risk of a miscarriage of justice is presented.

5. *Voir dire of witnesses.* During the trial, several of the Commonwealth's witnesses altered one or more elements of their version of events from earlier interviews and grand jury testimony. After learning of these changes, Macauda requested a mistrial or an opportunity to conduct a voir dire of the witnesses about the circumstances leading to the changes. Both requests were denied. Macauda argues that he was entitled to conduct a voir dire, and further contends that prosecutorial misconduct occurred because the Commonwealth failed to inform him of exculpatory information and because the Commonwealth presented false testimony. We conclude that the judge did not abuse his discretion (*Commonwealth* v. *Therrien*, 359 Mass. 500, 507 [(1971)], in refusing to allow a voir dire or in denying the motion for a mistrial. Furthermore, the record discloses no prejudicial misconduct by the prosecutor.

Helen Bozzi's only change of testimony involved whether, after the incident was over, she or Macauda was the first to call the other an obscene name. We do not believe this change is particularly relevant to the crimes of which Macauda has been convicted, and in any event, Bozzi was extensively cross-examined about this change.

At trial, Anthony Dimino indicated for the first time that Aiello and Macauda were the previously unidentified officers

---

[16] In his instructions, the judge stated that in order to prove murder, "the Commonwealth must prove . . . beyond a reasonable doubt . . . [t]hat the killing was committed with malice aforethought," and adequately defined malice as well as provocation and heat of passion. In his discussion of heat of passion, the judge noted: "There is no malice with respect to a killing of this nature, and the defendant is guilty at most of the crime of manslaughter."

whom he had earlier accused of assaulting Arthur Guttadauro in the hallway. See note 4, *supra*. Cross-examined at length, Dimino acknowledged that he testified before the grand jury that he did not get a good look at the two officers.[17] The judge's refusal to grant a voir dire does not require a new trial. *Commonwealth* v. *Daye,* 393 Mass. 55, 68, 71 (1984) (defendant's cross-examination as to prior inconsistent statements may significantly reduce witness's credibility to jury).

Charles Cella had previously described the weapon used by Macauda against Bordonaro as nunchaku. On direct examination, Cella testified both that Macauda was using nunchaku and that he hit Bordonaro with "a black instrument that had like a hook on the end." On cross-examination, Macauda elicited from Cella the asserted reasons for the change: "They [nunchaku] bend — if you slow them down they look like they bend." Cella admitted that he had read a newspaper account of the trial in which another witness was reported to have said that Bordonaro had been struck with a long, black instrument with a hook on its end. Cella denied, however, that his description was colored by the reported testimony of that or any other previous witness. Macauda thus was able to establish when and how Cella had changed his testimony, the reasons for the alleged change, and other possible reasons Cella might have used a different description. These were the very elements for which Macauda contends a voir dire was necessary.

Charles Tardivo materially changed his testimony at trial. For the first time, he identified Macauda as the officer who gave Bordonaro "three solid whacks on the head" with a nightstick. Macauda argues that a voir dire was necessary to determine the reasons for this change and when the Commonwealth learned of it. But in fact, both of these areas were explored at trial. At a lobby conference, the prosecutor specifically described the events leading to his knowledge that Tardivo would alter his past testimony.[18] Macauda has advanced no reason to

---

[17] The jury were made aware that Anthony Dimino had been indicted for assault and battery by means of a dangerous weapon on McLeod.

[18] The Commonwealth stated that on Wednesday, April 19, 1983, Tardivo was asked in an interview whether he remembered anything differently. Tar-

question this explanation. On cross-examination, Tardivo denied discussing the case with other witnesses, but admitted to following the trial in the newspapers and on television. Tardivo admitted that he had previously failed to identify Macauda. He indicated that he could now identify Macauda because he recognized Macauda's photograph in a newspaper and could thereby associate a name with the person he saw attacking Bordonaro. Tardivo was extensively cross-examined about his many prior statements which were markedly inconsistent with his identification of Macauda.[19] It is not apparent what additional information of value could have been gained through a voir dire examination. This is not a case where the defendant alleges that an in-court identification is the product of an impermissibly suggestive out-of-court identification. See *United States* v. *Wade,* 388 U.S. 218 (1967). The lack of a prior

---

divo indicated that he could then identify Aiello for the first time, as the person who allegedly said "John [McLeod], finish them off," during the second entry. At that point, the Commonwealth terminated the discussion to determine whether Tardivo's statement was consistent with his previous testimony. The next day, the Commonwealth instructed Tardivo to appear with counsel on the following Saturday for a recorded interview. At that interview, Tardivo also came forward with his identification of Macauda. Macauda received a copy of that recording on Saturday afternoon, shortly after the interview.

[19] One example of the many inconsistencies of Tardivo's identification and of the effect of cross-examination on these inconsistent statements is provided by the following colloquy:

COUNSEL FOR THE DEFENDANT MACAUDA: "Now, you say that after Officer Aiello went past you, Officer Macauda came around the corner?"

THE WITNESS: "He came directly to Vince Bordonaro and clubbed him at least three times."

COUNSEL: "Did you get a good look at him?"

THE WITNESS: "Yes."

COUNSEL: "Did you see his face clearly?"

THE WITNESS: "Yes."

COUNSEL: "No question in your mind?"

THE WITNESS: "He was only two feet away from me."

COUNSEL: "That's something you'd never forget?"

THE WITNESS: "Never."

COUNSEL: "And when you saw his picture, you would recognize it, wouldn't you?"

THE WITNESS: "When I saw his picture? I was unable to. Sometimes people don't look the same in a photograph as they do in person."

identification by Tardivo was "one factor which may properly be considered by the jury in evaluating the witness's credibility." *Commonwealth* v. *Lacy,* 371 Mass. 363, 369 (1976). Macauda "was given every opportunity to explore [the inconsistencies] in cross-examination." *Commonwealth* v. *Therrien, supra.* Moreover, Macauda did not seek a continuance to assess the new evidence, although the judge offered to allow whatever time was necessary. There is nothing to suggest that the judge was required to deal with Tardivo's changed testimony in another way. See *Commonwealth* v. *Redding,* 382 Mass. 154, 156 (1980).

Macauda also argues that with regard to the changes in the testimony of Bozzi, Dimino, and Cella, the Commonwealth repeatedly violated the rule of *Brady* v. *Maryland,* 373 U.S. 83 (1963), by failing to provide prior notice of changes in testimony that were exculpatory. But there is no evidence that the Commonwealth had any prior knowledge of Bozzi's or Dimino's changes. Indeed, the Commonwealth specifically denied such knowledge. The *Brady* rule, therefore, does not apply to the testimony of those two witnesses. See *United States* v. *Agurs,* 427 U.S. 97 (1976). As far as Cella's testimony is concerned, even if we were to accept Macauda's characterization of the changes as exculpatory (see *Commonwealth* v. *Ellison,* 376 Mass. 1, 20-22 & n.9 [1978]), Macauda suffered no prejudice. "[T]he cross-examination . . . was not only extended but searching, and we do not think it would have been materially improved by earlier warning about the witness' departure from [prior statements]." *Commonwealth* v. *Gilbert,* 377 Mass. 887, 895 (1979).

Macauda further contends that, by calling Cella and Tardivo as witnesses, the Commonwealth improperly presented evidence that it knew or should have known was false. See *Napue* v. *Illinois,* 360 U.S. 264 (1959). However, the record reveals no evidence supporting this assertion and Macauda offers none. Simply because a witness alters some portion of his testimony at the time of trial is not a sufficient reason to conclude that the new testimony is false, or that the Commonwealth knew or had reason to know that it was false. "Presentation of a

witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury. It was for the jury to decide whether or not to credit the witness." *United States* v. *Holladay,* 566 F.2d 1018, 1019 (5th Cir.), cert. denied, 439 U.S. 831 (1978). Cf. *Commonwealth* v. *Lacy,* 371 Mass. 363, 369 (1976) (lack of prior identification).

6. *Independent, intervening cause.* Macauda contends that the judge erred by refusing to give Macauda's proposed instruction to the jury on independent, intervening cause.[20] Considering the ambiguous and potentially misleading language of the proposed instruction, we conclude that the judge was correct.

Macauda's proposed instruction could be read to imply an incorrect statement of law. One interpretation of a part of the first sentence could be that if the jury found that Macauda's actions in the first entry were not the sole cause of Bordonaro's death, Macauda could not be found guilty of homicide unless the jury also found that he was responsible for the conduct of those involved in the second entry. Similarly, the second sentence clearly comprehends that if the jury found that Macauda's acts were not themselves wholly sufficient to cause Bordonaro's death, Macauda must be acquitted of any degree of homicide. These implications are contrary to the long-standing rule in this Commonwealth: "If a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death

---

[20] The proposed instruction reads: "In order to find any individual defendant guilty of murder or manslaughter you must find beyond a reasonable doubt that his actions were the cause of the death of Vincent Bordonaro, or that he was responsible for the actions of any other defendant who you find contributed to or caused the death and whose actions occurred after the actions of that defendant. Thus, if you are unable to find beyond a reasonable doubt that the initial actions of any individual defendant was [*sic*] sufficient to cause the death in question, you may not find that individual defendant guilty of murder or manslaughter unless you find beyond a reasonable doubt that that individual was responsible for the subsequent acts of another defendant, pursuant to the theory of joint venture or joint criminal enterprise, which I have previously defined."

The proposed instruction is not included in the defendants' record appendix, although "[i]n criminal cases, the appendix . . . shall contain . . . (3) any paper filed in the case relating to an issue which is to be argued on appeal." Mass. R. A. P. 18 (a), as amended through 392 Mass. 1106 (1984). The Commonwealth has provided the instruction in its brief.

follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result." *Commonwealth* v. *Hackett*, 2 Allen 136, 142 (1861). Accord *Commonwealth* v. *Rhoades*, 379 Mass. 810, 823 n.12, 825 (1980); *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 463 (1942). See *People* v. *Caldwell*, 36 Cal. 3d 210, 220 (1984) (defendant's acts must be a "substantial factor" contributing to death); *People* v. *Kibbe*, 35 N.Y.2d 407, 413 (1974) ("sufficiently direct" cause). Thus, Macauda's liability as a contributing cause of Bordonaro's death need not be related to any theory of joint liability, nor need Macauda's acts have been the sole cause of death.

While the judge was required to instruct the jury on any issues which could be inferred from the evidence (see *Commonwealth* v. *Pinnick*, 354 Mass. 13, 15 [1968]), he was not required to give an instruction that misstated the law. *Commonwealth* v. *Monahan*, 349 Mass. 139, 170-171 (1965). *Commonwealth* v. *Perry*, 254 Mass. 520, 530 (1926). We hold that the judge's instructions adequately covered the issues concerning independent, intervening cause. If Macauda preferred a different or more detailed instruction on this issue, he was required to state the law properly in his proposed instruction. Even had Macauda done so, it is not clear that the facts would have warranted giving the instruction. See *Commonwealth* v. *Golston*, 373 Mass. 249, 256 (1977), cert. denied, 434 U.S. 1039 (1978) (to supersede defendant's liability, intervening cause must be the sole cause, not merely a contributing cause).[21]

7. *Motion for a required finding of not guilty.* At the close of the Commonwealth's case, the judge denied Macauda's

---

[21] The judge was correct in giving the remainder of the California jury instruction, a different portion of which was approved in *Rhoades, supra* at 825: "There may be more than one proximate cause of death. When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death." California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979).

motion for a required finding of not guilty on the indictment charging him with murder.[22] See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). Macauda contends that his motion should have been allowed. He argues that the testimony of the Commonwealth's medical expert was insufficient to show that Macauda's acts were the proximate cause of Bordonaro's death.

We review this argument, based on the evidence at the close of the Commonwealth's case, construed in the light most favorable to the Commonwealth. *Commonwealth* v. *Porter,* 384 Mass. 647, 651-652 (1981). Macauda's motion was properly denied "if all the circumstances including inferences [that are not too remote according to the usual course of events] are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." *Commonwealth* v. *Nickerson,* 388 Mass. 246, 251-252 (1983), quoting *Commonwealth* v. *Latimore,* 378 Mass. 671, 676 (1979). Each element of the offense must meet that test. *Commonwealth* v. *Latimore, supra* at 677-678. Thus, considering in the best light only the evidence introduced by the Commonwealth, coupled with any reasonable inferences which may be drawn from that evidence, we must determine whether a jury would have been warranted in concluding that Macauda's acts were a proximate cause of Bordonaro's death. We decide that, although the testimony of the Commonwealth's expert witness alone was insufficient to support Macauda's conviction, there was sufficient additional evidence which, combined with the expert witness's testimony, supports such a conviction. Therefore, there was no error.

The Commonwealth's expert witness testified that Bordonaro died from acute subdural hematoma and cerebral contusions caused by "one *or* multiple blunt force injuries to the head" (emphasis added). He was unable to determine which injuries caused death, nor was he able to determine whether a single injury caused death, or whether death was the cumulative result of all of the injuries. He simply stated, "It could have

---

[22] The motion is not included in the defendants' record appendix. See note 20, *supra.* See also Mass. R. A. P. 18 (a).

been from one injury or from multiple injuries." From this testimony, it is impossible to say whether Macauda's blows contributed to Bordonaro's death or whether some especially severe blow occurred during the second entry that cut off the effects of all previous blows and was itself the sole cause of death. Standing alone, this testimony of the expert witness would be insufficient to forge the causal link between Macauda's acts and Bordonaro's death.

Of course, it would also be possible to conclude that the cumulative effect of all the blows was required for death. In that case, there clearly would be a sufficient causal connection between Macauda's actions and Bordonaro's death. But when the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. *Commonwealth* v. *Croft,* 345 Mass. 143, 145 (1962). *Smith* v. *First Nat'l Bank,* 99 Mass. 605, 612 (1868). See *Commonwealth* v. *Burke,* 339 Mass. 521, 528-529 (1959); *Commonwealth* v. *Shea,* 324 Mass. 710, 713 (1949).

Nevertheless, the Commonwealth need not rely solely on that inconclusive expert testimony. The Commonwealth's expert witness also testified that there had been four or five blows to the head *each* of which required the application of "severe" force. There was also testimony that Macauda struck Bordonaro once with a tire iron (Bozzi); once with a black, hooked instrument or nunchaku (Cella); "three solid whacks on the head" with a nightstick (Tardivo); as well as testimony that Macauda hit someone on the bed (where Bordonaro was lying or sitting) an unspecified number of times with an unspecified object (Charles Dimino). Furthermore, there was evidence that after the first entry, in which Macauda participated, Bordonaro became unconscious and did not regain consciousness until after the second entry.

As we have already noted, Macauda could be convicted of a degree of murder or of manslaughter if the jury found that his acts contributed to Bordonaro's death, even if his actions alone would not have been sufficient to cause the death. Given the testimony on the number and force of the blows required

to kill Bordonaro, the eyewitness testimony that Macauda struck the victim, the types of weapons Macauda was alleged to have used, and the state of the victim after the attack in which Macauda participated,[23] we conclude that there was sufficient evidence for the jury to determine beyond a reasonable doubt that Macauda's acts were a proximate cause of Bordonaro's death. A jury would have been warranted in finding that either Macauda's blows alone or all the defendants' blows together caused Bordonaro's death, despite the testimony of the Commonwealth's expert witness. See *Commonwealth* v. *Smith,* 357 Mass. 168, 178 (1970) ("The law should not, and does not, give the opinions of experts on either side of the issue the benefit of conclusiveness, even if there are no contrary opinions introduced at trial"). See also *Commonwealth* v. *Lunde,* 390 Mass. 42, 47 (1983), and cases cited.

This is not a case where the defendant's guilt "is left to conjecture or surmise and has no solid foundation in established facts." *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 55 (1975), quoting *Commonwealth* v. *O'Brien,* 305 Mass. 393, 401 (1940). Nor is the issue left "trembling in the balance." *DeFilippo's Case,* 284 Mass. 531, 535 (1933). Instead, this is a situation where a verdict of manslaughter "was warranted from these facts in conjunction with a common sense understanding of the entire situation." *Commonwealth* v. *Aguiar,* 370 Mass. 490, 500 (1976). See 2 J. Wigmore, Evidence § 568, at 779 (Chadbourn rev. 1979). In these circumstances, conclusive expert testimony was not required in order to permit an inference that a blow to the head with a tire iron is a sufficiently contributing proximate cause of death.

In conclusion, we reject each of the arguments advanced by the defendants to set aside their convictions. Finding no error, we therefore affirm the judgments of conviction entered on the jury verdicts in the Superior Court.

*Judgments affirmed.*

---

[23] Indeed, the jury could have found that Macauda alone had struck Bordonaro during the first entry.