COMMONWEALTH *vs.* RONALD SOUZA.

No. 92-P-441.

Bristol. March 16, 1993. - May 4, 1993.

Present: FINE, JACOBS, & GREENBERG, JJ

*Homicide. Proximate Cause. Malice. Intoxication. Practice, Criminal*, In-
structions to jury. *Evidence*, Illustrative exhibit.

Evidence at a murder trial was sufficient to prove that the defendant's acts
were the proximate cause of the victim's death. [438-440]
At a second degree murder trial, the judge's incorrect instructions to the
jury, that they could not consider the defendant's intoxication in deter-
mining whether he had the requisite intent for purposes of the "third
prong" of malice, did not create a substantial likelihood of a miscar-
riage of justice, where the evidence of the defendant's incapacity due to
consumption of alcohol was not substantial and where the defendant's
actions and comments in the course of the incident strongly indicated
the defendant's knowledge of the relevant circumstances, the only sub-
jective part of the third prong of malice. [440-443]
At a murder trial no substantial risk of a miscarriage of justice was cre-
ated by the judge's "slip of the tongue" in her otherwise comprehensive
and correct instruction on reasonable doubt, which she corrected in an
effective manner. [443-444]
There was no error at a murder trial in the judge's allowing a metal stud-
ded leather wrist band, identified as similar to the one the defendant
used to assault the victim, to be displayed to the jury. [444-445]

INDICTMENT found and returned in the Superior Court De-
partment on August 4, 1987.

The case was tried before *Elizabeth J. Dolan*, J.

*Dana A. Curhan* for the defendant.

*Kevin E. Connelly*, Assistant District Attorney, for the
Commonwealth.

FINE, J. After separate trials, the defendant and Richard J.
Viveiros were convicted of second degree murder in the death

of Joseph Brum.[1] On appeal, the defendant claims that the evidence was insufficient to prove that his acts were the proximate cause of Brum's death, that errors in the instructions created a substantial risk of a miscarriage of justice, and that the judge erred in allowing a leather wrist band with metal spikes on it to be displayed to the jury. We affirm the defendant's conviction.

On the basis of the Commonwealth's evidence against the defendant, the jury could have found the following facts. During the afternoon of July 21, 1987, Brum, his two teen-aged sons, a neighbor, the defendant, and Viveiros were drinking beer and wine and socializing on the front porch of 47 Boutwell Street in Fall River. When the discussion turned to the subject of gangs, Viveiros and the defendant became upset and expressed anger towards Brum. Viveiros said to the defendant, "Let's get the fuck out of here," and to Brum, "We'll be back." The defendant shook Brum's hand. Viveiros and the defendant then left the porch and drove away. Brum, very drunk, crossed the street to a parked truck in which he lay down. After a while he attempted to get out of the truck but fell from a step. First his hands, then his face, then his feet, and eventually his whole body hit the ground. He got up, staggered, and reentered the truck. Fifteen or twenty minutes later, the defendant and Viveiros returned to the area in a car. They brought with them a baseball bat, and the defendant wore a black leather wrist band with metal spikes on it. For a short while they visited, and drank beer, in an apartment on the first floor of 47 Boutwell Street. Then they approached Brum, said something to him, and proceeded for the next twenty minutes or so to beat him. The defendant hit Brum in the face with the spiked wrist band.

---

[1]This court affirmed Viveiros's conviction and an order denying a motion for new trial in an unpublished order. See *Commonwealth* v. *Viveiros*, 29 Mass. App. Ct. 1102 (1990). After the defendant's conviction, Viveiros brought a second motion for a new trial, claiming ineffectiveness of trial counsel in failing to present the medical evidence tending to negate causation which had been presented at the defendant's trial. That motion was also denied, and the denial was affirmed in another unpublished order. See *Commonwealth* v. *Viveiros*, 33 Mass. App. Ct. 1117 (1992).

When Brum fell, they kicked him with their boots and hit him with the bat all over his body, including his stomach. During the beating, either the defendant or Viveiros warned Brum that if he were to "[get] anyone else into it," they would come back and kill him. With Brum lying on the ground covered with blood, the defendant and Viveiros gave a "thumbs up" sign to an observer. One of them told Brum, "You're lucky you're staying there alive," and they drove away. Brum was taken to the hospital and died the next day. Dr. George Lauro performed an autopsy and found that the cause of death was "peritonitis secondary to an infarcted bowel resulting from blunt trauma."

1. *Causation.* "[P]roximate cause . . . 'is a cause, which, in the natural and continuous sequence, produces the death, and without which the death would not have occurred.' California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979)." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980). The defendant contends that his motion for a required finding of not guilty of murder[2] should have been allowed under the standard set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), as, he argues, no rational trier of fact could have found beyond a reasonable doubt that his actions were the proximate cause of Brum's death. We consider the contention even though it is made for the first time on appeal, because if, indeed, there were insufficient evidence to take the case to a jury, it would be a miscarriage of justice to let the verdict stand.

Dr. Lauro's opinion was that a blunt force injury caused Brum's peritonitis which, in turn, caused his death. The blunt force, according to Dr. Lauro, could have been any one of a number of instruments, such as a fist, a heel of a shoe, or a baseball bat, or it could have been the striking of the ground in a fall. The defendant contends that Dr. Lauro's testimony does not support the verdict because, given the evidence that Brum sustained a fall, the testimony was equally consistent with two propositions: that Brum's fatal peritonitis

---

[2]The defendant concedes that the verdict would not be invalid on this ground as to the lesser included offense of assault and battery.

was caused by the fall, for which the defendant was not responsible; and that it was caused by the beating, for which he was responsible. A verdict of guilty, the defendant therefore contends, could only have been based upon pure speculation. See *Berry* v. *Commonwealth*, 393 Mass. 793, 796 (1985); *Commonwealth* v. *Salemme*, 395 Mass. 594, 599-601 (1985).

We do not think, however, that a fair appraisal of the evidence would have left a rational fact finder in the realm of speculation. The witness who testified about the fall was clear that Brum first hit the ground with his hands, then his head, then his feet, and then the rest of his body. On the other hand, the testimony about the beating indicated that it was severe and protracted and that Brum received multiple blows to his abdominal area with a baseball bat and shod feet. The jury could reasonably have inferred that the trauma to Brum's abdominal area was substantially greater from the beating than from the fall and that it was the beating, therefore, which caused the peritonitis. While a reasonable juror could have believed that it was possible that the fall was the blunt force that caused the fatal condition, the Commonwealth was not required to "exclude every reasonable hypothesis of innocence." *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989).

The defendant produced testimony from Dr. Phillip Walton Smith, who treated Brum when he arrived at the hospital. Dr. Smith testified that, in his opinion, Brum died as a result of cardiac arrest, caused by delirium tremens which, in turn, resulted from excessive alcohol consumption. (Brum's blood alcohol level upon entering the hospital was recorded at levels which varied between .42 and .49.) Even had the defendant renewed his motion for a required finding of not guilty at the conclusion of all the evidence, which he did not, Dr. Smith's testimony would not affect our conclusion as to the validity of the verdict. The conflict in the evidence between Dr. Smith's testimony, in which there were weak-

nesses,[3] and Dr. Lauro's did not cause the Commonwealth's case to "deteriorate," and it was for the jury to resolve the conflict. See *Commonwealth* v. *Hastings*, 22 Mass. App. Ct. 930, 931 (1986).

2. *Instructions on malice.* The judge directed a verdict as to so much of the indictment as alleged first degree murder. As to second degree murder, the judge charged the jury on all three prongs of malice. On the first two prongs of malice, intent to kill and intent to do grievous bodily harm, the judge instructed the jury that they could consider the defendant's intoxication in determining whether he had the requisite intent. See *Commonwealth* v. *Grey*, 399 Mass. 469, 470-471 (1987). As to the third form of malice, which "may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act," *id.* at 470 n.1., the judge told the jury that "voluntary intoxication does not operate to prevent a defendant from forming the general intent as specified in that third form of malice." The defendant did not object to the instruction. According to *Commonwealth* v. *Sama*, 411 Mass. 293, 298 (1991), decided after the trial in this case, there was error in the charge. We consider, therefore, whether the error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Costa*, 414 Mass. 618, 627 (1993). We conclude that it did not.

A correct instruction would have informed the jurors that they could consider the defendant's intoxication in determining his knowledge of the relevant circumstances, the only subjective part of the third prong of malice. See *Commonwealth* v. *Blake*, 409 Mass. 146, 155 (1991); *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992). In this case, knowledge

---

[3]For example, Dr. Smith admitted to having little knowledge concerning acute alcoholism, he was both unaware of and unconcerned about the information in the medical records showing that the victim had symptoms of peritonitis from the time of his admission to the hospital, and he admitted that, had he had the autopsy results when he first rendered his opinion, he would have listed peritonitis as one of the diagnoses.

of the relevant circumstances would have consisted of the defendant's awareness that he and Viveiros were kicking Brum and beating him with the bat and the spiked wrist band. The question is whether a correct instruction on the third prong of malice might have created reasonable doubt in the minds of the jurors that the defendant had knowledge of those circumstances.

There was considerable evidence before the jury that the defendant had been drinking beer and wine and was intoxicated. While on the porch, the entire group socializing there was described by witnesses as "tipsy" and "drunk," and Viveiros and the defendant were described as "wobbly" as they walked away from the porch. When they returned to the area about an hour later, they were described by a witness as "drunk," and before the attack they had yet another beer.

On the other hand, the actions and comments of the defendant and Viveiros throughout the episode strongly indicate awareness of the relevant circumstances. The defendant left the group in the company of Viveiros after an argument with Brum and after Viveiros promised to return. They drove to some location where they changed clothes and obtained the bat and spiked wrist band. They drove back to the area and found Brum in the truck. After they talked to Brum, the defendant joined Viveiros in the beating. In the course of the beating, either the defendant or Viveiros said, "if [Brum] got anyone else into it, . . . they were going to come back and kill him." When a neighbor said, "Look, don't you think you hit him enough? Leave him alone. I'll call the cop," one of them replied, "Call the cop. What the hell do I care?" As they were leaving, one of them said to Brum as he lay on the ground, "You're lucky you're staying there alive." The defendant gave a "thumbs-up" gesture to a bystander as he left with Viveiros before driving away.[4]

[4]The evidence indicates that the defendant fled the area soon after the incident. Both Viveiros's and the defendant's vehicles were at Viveiros's residence at 3:30 A.M. on the day following Brum's death, but neither Viveiros nor the defendant was there. Although the police were looking for him, the defendant was not apprehended until ten months later when he was found hiding under a bed at his mother's house.

In the two cases in which convictions were reversed for similar errors in the charge on malice, not only did the defendant request a correct instruction at trial, but also the evidence of the defendant's incapacity due to consumption of alcohol was far more substantial. Thus, in *Commonwealth* v. *Sama*, 411 Mass. at 298-299, "[t]he defendant presented credible evidence of debilitating intoxication bearing on his ability to possess meaningful knowledge of the circumstances at the time of the victim's death. The defendant testified that he long has suffered from uncontrolled alcoholism which in the past has caused him to experience memory loss. Moreover, the defendant's father testified and described his son's chronic substance abuse and what he perceived to be his son's resulting mental impairment. Lastly, an expert witness testified on behalf of the defendant, and she opined that the defendant could have hallucinated at the time of the killing, due to the effect of the alcohol and drugs he ingested earlier that day." In *Commonwealth* v. *McLean*, 32 Mass. App. Ct. 978 (1992), the defendant testified that he was severely intoxicated from drinking eighteen to twenty beers and smoking cocaine, causing him to "freak out" and "black out" while strangling the victim.[5]

There are other cases in which a similar error in the instructions was made and there was evidence of significant consumption of alcohol, but the convictions were not reversed. See *Commonwealth* v. *Sires*, 413 Mass. at 300 (even though the defendant requested a correct instruction, evidence that the defendant was intoxicated and did not remember anything after shooting his mother did not raise a jury issue requiring the instruction); *Commonwealth* v. *Costa*, 414 Mass. at 628 (failure to instruct the jury correctly on the third prong of malice was not reversible error, even in light of evidence that the defendant had several beers, whiskey, and a "scorpion bowl" before shooting the victim, because the jury found first degree murder, and also because the evidence of the defendant's actions supported the conclusion

---

[5]The facts, which are not recited in the rescript opinion, are from the record in the case.

that he was capable of having the requisite knowledge). See also *Commonwealth* v. *Freiberg*, 405 Mass. 282, 287 (1989); *Commonwealth* v. *Ewing*, 30 Mass. App. Ct. 285, 291 (1991). Compare *Commonwealth* v. *Fano*, 400 Mass. 296, 307 (1987); *Commonwealth* v. *Gould*, 413 Mass. 707, 711 n.4 (1992).

In this case there was neither testimony from the defendant as to his impairment at the time of the attack nor testimony from an expert, such as is almost always included in such cases, see *Commonwealth* v. *Cruz*, 413 Mass. 686, 690-691 & n.6 (1992), that the defendant's condition prevented him from having the knowledge required for guilt of murder. Further, there was very little evidence about the consumption of alcohol and its effects that was specific to the defendant. Considering what evidence there was of the defendant's intoxication in light of all the evidence, in particular his actions and the comments made in the course of the incident, we conclude that the error in the charge did not create a substantial risk of a miscarriage of justice.

3. *Instruction on reasonable doubt.* When the judge charged the jury on the definition of reasonable doubt, she omitted the word "cannot," thereby presenting in one sentence a definition that was "the exact inverse of what it should have been." *Commonwealth* v. *Wood*, 380 Mass. 545, 548 (1980), quoting from *Dunn* v. *Perrin*, 570 F.2d 21, 24 (1st Cir.), cert. denied, 437 U.S. 910 (1978). The judge stated: "Reasonable doubt is that state of the case which, after an entire comparison and a consideration of all of the evidence, leaves your minds as jurors in that condition in which you say you feel an abiding conviction to a moral certainty of the truth of the charge in the case." There was no objection. The jury had deliberated for an hour and a half when the judge, sua sponte, called them back to inform them that she had inadvertently omitted from the definition of reasonable doubt a "very important word." She then read to the jury the correct definition. There was no objection to the manner in which the judge made her correction.

"To determine whether a definition of reasonable doubt accurately conveys the meaning of the term, it is necessary to consider the charge as a whole." *Commonwealth* v. *Watkins*, 377 Mass. 385, 388, cert. denied, 442 U.S. 932 (1979). In all respects, other than the one "slip of the tongue" that was later corrected in an effective manner, the charge on reasonable doubt was comprehensive and correct. See *Commonwealth* v. *Washington*, 28 Mass. App. Ct. 271, 275 (1990). There was no substantial risk of a miscarriage or justice.

4. *Display of leather wrist band with metal spikes.* The defendant filed a motion in limine requesting that the judge exclude from evidence the leather wrist band with spikes found in a search of Viveiros's home. The defendant contended that no blood was found on the wrist band and that no witness would be able to identify it as the one used in the alleged offense. Except with respect to the Commonwealth's opening statement, the motion in limine was denied. During trial, one witness stated that, when she saw the defendant give her a "thumbs up" gesture prior to driving away from the scene, she noticed that "[h]e had a black bracelet with — I don't know what you call it. You know like a biker's bracelet . . . those black bracelets with studs on it." A second witness stated that she saw that the defendant "had a black wrist thing . . . it had like spikes on it; and he started, you know, hitting [the victim] right in the face with that . . . . I did see a black band on him with some spikes on it." Over the defendant's objection, the prosecutor was given permission to show the wrist band to the witness and, implicitly, to the jury. When asked if she recognized it, the witness said, "this is something like what he was wearing." The wrist band was then marked for identification.

So long as it was displayed to the jury, we think it makes little difference whether the wrist band was admitted as an exhibit or merely marked for identification. It was not an abuse of discretion for the judge to have allowed the wrist band, similar but perhaps not identical to the one used, to be displayed to the jury. See *Commonwealth* v. *Ellis*, 373 Mass. 1, 7 (1977); *Commonwealth* v. *Florentino*, 381 Mass. 193,

196-197 (1980); *Commonwealth* v. *Stewart*, 398 Mass. 535, 541-542 (1986). The questioning of the witness made it clear to the jury that she could not say the object displayed was the wrist band actually used in the beating. The defendant made no request at trial for cautionary instructions concerning the wrist band. In the circumstances, failure to give them did not create a substantial risk of a miscarriage of justice.

*Judgment affirmed.*