## COMMONWEALTH *vs.* CHARLES M. FLYNN.

No. 93-P-1215.

Bristol. April 14, 1994. - October 25, 1994.

Present: WARNER, C.J., DREBEN, & JACOBS, JJ.

Further appellate review granted, 419 Mass. 1104 (1995).

*Practice, Criminal,* Required finding, Instructions to jury. *Homicide. Joint Enterprise. Proximate Cause. Malice. Wanton or Reckless Conduct. Intoxication. Evidence,* Consciousness of guilt.

At the trial of an indictment for second degree murder where the Commonwealth's theory was that the defendant had caused the victim's death individually and as a joint venturer with another, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt; the judge correctly denied the defendant's motion for a required finding of not guilty. [554-555]

At the trial of an indictment for second degree murder in which the defendant was convicted of manslaughter, there was no substantial risk of a miscarriage of justice in the judge's instructions on involuntary manslaughter that omitted an instruction on the defendant's knowledge and incorrectly stated that intoxication has no bearing on manslaughter, where the evidence strongly indicated the defendant's awareness of the relevant circumstances at the time and the evidence of incapacity due to intoxication was not "abundant"; correct instructions would not have created a reasonable doubt in the minds of the jurors. [555-559]

At the trial of an indictment for murder in the second degree, the judge's instructions taken as a whole made it clear that the defendant's actions had to be a proximate cause of the victim's death. [559]

At a criminal trial the judge did not abuse his discretion in granting the defendant's request that an instruction on consciousness of guilt not be given. [559-560]

INDICTMENT found and returned in the Superior Court Department on July 12, 1990.

The case was tried before *William H. Carey,* J.

*Jane Larmon White,* Committee for Public Counsel Services, for the defendant.

*Mary O'Neil,* Special Assistant District Attorney, for the Commonwealth.

DREBEN, J. At 2 A.M. on June 29, 1990, the body of Wayne Hubbard was found lying in a parking lot across the street from a bar known as "Bev's Place" in New Bedford. The defendant was charged with second degree murder. The Commonwealth's case against the defendant was two-fold: the defendant had caused the victim's death individually, and as a joint venturer with one Timothy Davis.[1] After a jury trial, the defendant was found guilty of manslaughter.

While conceding that there was sufficient evidence to convict him on a theory of joint venture, the defendant claims he was entitled to a required finding of not guilty on a theory of individual liability. Since it is impossible to tell on what ground the jury made its decision, he asserts his conviction must be set aside. *Commonwealth* v. *Fickett,* 403 Mass. 194, 197 (1988). See *Commonwealth* v. *Matchett,* 386 Mass. 492, 511 (1982). He also argues that the prosecutor's closing argument was unduly prejudicial and that errors in the judge's charge created a substantial risk of a miscarriage of justice. While we agree that the judge's instructions were erroneous, we see no such risk and affirm the defendant's conviction.

1. *Required finding of not guilty.* According to the medical examiner, the cause of Hubbard's death was a "subarachnoid hemorrhage at the base of the brain and brain swelling due to multiple blunt force injuries [at least five] of the face and head." The defendant bases his claim of insufficient evidence primarily on the testimony of William Camacho, an eyewitness to the pummeling of Hubbard.

Camacho had not known either the victim or the assailants prior to his encounter with them at Bev's Place on the eve of the incident. While in the bar, Camacho saw the defendant appear to try to stop Davis from attacking Hubbard. Camacho left the bar with Davis, having agreed to give him a ride home in exchange for some marihuana. The two were joined by the defendant, and as they entered the parking lot Hub-

---

[1]Davis had previously pleaded guilty to manslaughter.

bard appeared. Davis punched Hubbard in the face; Hubbard fell to the ground, and thereafter Camacho did not see him move. Davis kept pounding Hubbard on his face with his hands while at the same time the defendant was kicking "him in his upper and lower part of the body"; the defendant kicked Hubbard hard[2] six or seven times. Camacho saw the defendant kick Hubbard in the chest, but "not in his head or his face." When pressed by defense counsel as to what part of the upper body the defendant had kicked, Camacho replied, "I would say ribs because he was laying on the side. It's not like I'm looking at him with a magnifying glass, finding out exactly where he is hitting him."

The episode lasted from forty-five seconds to a minute and a half, and, twice, the defendant told Davis, "Let's go. Stop it." After the two men had finished their attack on Hubbard, they still wanted a ride from Camacho, and they directed him as he drove. At one point, the defendant made him return near the bar, and as they drove by, the defendant said, "He's probably dead. It's between the three of us, and if you say anything, I'm going to shoot you in the back of the head." During the ride, Davis bragged about the beating he had given Hubbard, and the defendant described how he had spread Hubbard's legs with his foot and kicked him in the groin.

Camacho's account of the incident was not the only one presented at trial. Although the defendant did not take the stand, police officers testified to statements he had made to them during three interviews. The first discussion took place on June 30. The defendant stated that he saw a scuffle across the street when he left Bev's Place, but could not recall anything about it. He had a telephone conversation with Davis the next morning in which Davis stated that he had blood on his hands and had asked the defendant what had happened the night before. The defendant also mentioned that he had read in the newspaper about an individual being found dead

---

[2]Although the answer that elicited the response "hard" kicks was excluded on redirect examination, it was excluded because the manner of kicking had been demonstrated on direct examination.

outside of Bev's Place, that he felt that Davis had something to do with it; when Davis was drinking, he liked to hurt people.

The defendant spoke to the police again on July 1. When asked how much he had had to drink, he wasn't sure, but he had had thirty dollars when he arrived at the bar and no money the next morning. On that basis, he estimated that he might have had sixteen or seventeen rum and cokes. He also had taken some prescription drugs: five to eight Xanax pills. Although at first he said there was some sort of argument going on in the parking lot, but he could not recall the parties involved, he later said he had been untruthful, and he knew that the person arguing was Davis and that he had punched and knocked someone to the ground. Davis had also hit the man several times with an object he took out of a car. The next day Davis came to the defendant's apartment and informed him that the police wanted to talk to him (Davis). The defendant told Davis that he would like it if Davis left his name out of the conversation.

The third interview was on July 2. The defendant admitted that his previous accounts were incomplete and that he knew more about the incident. He had seen Davis arguing with Hubbard and had joined them. He stated that he (the defendant) had given Hubbard "a couple of shots to the face, meaning he struck the victim in the face," that he had thrown the first punch, and that Hubbard, in turn, struck back at the defendant causing him to fall down on the ground. Thereafter Davis "really started whaling" on Hubbard, and later hit him with a pipe.

While recognizing that the jury may believe part of a witness's testimony and reject part, see *Commonwealth* v. *Perez*, 390 Mass. 308, 314 (1983), the defendant argues that the jury would be distorting integral portions of the testimony if they based individual liability on either Camacho's testimony or on the defendant's own statements to the police. On Camacho's version, the defendant never struck Hubbard on the face, neck, or head. On the defendant's account, there was no evidence as to the amount of force with which the blows were

delivered, and there was no proof that Hubbard was harmed by the two to four "shots" delivered by the defendant. After all, according to the defendant, Hubbard had retaliated strongly against the defendant and had knocked him down.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 678-679 (1979). "[I]t is not essential that the inferences drawn should be the only necessary inferences. It is enough that they be reasonable and possible." (Citations omitted). *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926). *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992). That the Commonwealth's evidence was at times inconsistent does not mean there was insufficient evidence. *Commonwealth* v. *Clary*, 388 Mass. 583, 589 (1983).

The medical examiner testified that, while even one blow could have killed Hubbard, he could not say which of the multiple blows was the fatal one. The jury could reasonably have inferred from the description of the defendant's kicks as recounted by Camacho and from Camacho's demonstration of them that the punches to Hubbard's face admitted to by the defendant were severe and that one of the defendant's blows was a fatal one. Moreover, it is not necessary to support a theory of individual liability to prove that one of the defendants' blows would in itself have been fatal. Where two assailants participate in a fatal beating, there would be a sufficient causal connection if both "defendants' blows together caused [the victim's] death." *Commonwealth* v. *McLeod*, 394 Mass. 727, 748, cert. denied, 474 U.S. 919 (1985). It was for the jury to determine whether the relation between cause and effect had been proved between the defendant's blows and the victim's death. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 463 (1942).

That Davis, too, may have delivered a fatal blow is not dispositive. "If a person inflicts a wound . . . in such manner as to put life in jeopardy, and death follows as a consequence of this . . . act, it does not alter its nature or diminish its

criminality to prove that other causes cooperated in producing the fatal result." *Commonwealth* v. *Hackett*, 2 Allen 136, 142 (1861). *Commonwealth* v. *Giacomazza*, 311 Mass. at 463. *Commonwealth* v. *McLeod*, 394 Mass. at 744-745. "Thus, [the defendant's] liability as a . . . cause of [Hubbard's] death need not be related to any theory of joint liability, nor need [the defendant's] acts have been the sole cause of death." *Id.* at 745. See Nolan & Henry, Criminal Law § 123 (2d ed. 1988). In *McLeod, supra* at 745 n.21, the court also approved of a portion of the California jury instruction, which stated: "There may be more than one proximate cause of death."[3]

2. *Jury instructions as to knowledge and intoxication.* In *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990), the Supreme Judicial Court held that "a person henceforth may be prosecuted for involuntary manslaughter only for causing an unintentional death (1) during the commission of wanton or reckless conduct, as defined in *Commonwealth* v. *Welansky*, [316 Mass. 383 (1944)], or (2) during the commission of a battery."[4] In addition, as indicated in *Catalina, supra*, and reiterated in *Commonwealth* v. *Sneed*, 413 Mass. 387 (1992), "each type of involuntary manslaughter requires a showing that the defendant knew, or should have known, that his conduct created a high degree of likelihood that substantial harm would result to another." *Id.* at 393. The difference between the elements of the third prong of malice and of involuntary manslaughter lies not in the knowledge aspect,

---

[3]The remaining portion of the California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979) approved in *McLeod* states:

> "When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death."

[4]The second form of involuntary manslaughter is often described as "unlawful-act manslaughter" and applies "only if the unlawful act is a battery not amounting to a felony, when the defendant knew or should have known that the battery he was committing endangered human life. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 785, 787 (1990)." *Commonwealth* v. *Sires*, 413 Mass. 292, 302 n.10 (1992).

which is the same for both, but rather "in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew." *Commonwealth* v. *Sires*, 413 Mass. 292, 303-304 n.14 (1992). Thus, in determining whether the defendant is guilty of involuntary manslaughter, the jury should consider the nature and extent of the defendant's knowledge at the time he acted, and whether in the circumstances known by the defendant, a reasonably prudent person would have recognized that his conduct would create a high degree of likelihood that substantial harm will result to another. See *Commonwealth* v. *Sama*, 411 Mass. 293, 298 (1991).

"[E]vidence of the defendant's voluntary intoxication is a factor for the jury to consider whenever the Commonwealth bears the burden of establishing the knowledge of the defendant beyond a reasonable doubt." *Commonwealth* v. *Delaney*, 418 Mass. 658, 665 (1994), quoting from *Commonwealth* v. *Sires*, 413 Mass. at 299. Thus, where "there is evidence of the effects of the consumption of a drug or drugs (including alcohol) that, if believed, would be relevant to a defendant's . . . knowledge," a simple instruction should be given stating that "the jury may consider credible evidence of the effects of the defendant's consumption of drugs in deciding whether the Commonwealth had met its burden of proving the defendant's [knowledge] beyond a reasonable doubt." *Commonwealth* v. *Sires*, 413 Mass. at 300-301. The present case, although prosecuted after *Catalina*,[5] did not have the benefit of the later opinions, and, regrettably, the instructions were erroneous.

The judge's summary of his manslaughter instructions (which were to the same effect as his previous explanation) stated:

> "Therefore, if, after considering all of the evidence, you find that the Commonwealth has proved beyond a rea-

---

[5]The incident occurred three days before the decision in *Catalina* which was issued on July 3, 1990, but the prosecution was subsequent. The case went to the jury on March 22, 1992.

sonable doubt that the defendant did commit an assault and battery upon the alleged victim, that the assault and battery caused the death of the victim, that the assault and battery was committed without justification or excuse, then you shall find the defendant guilty of manslaughter under this lesser-included offense."[6]

There was no objection to this charge. Not only did the judge not charge on the requirement of knowledge, but he also informed the jury that "intoxication has no bearing on the crime of manslaughter." Again, there was no objection.

The Commonwealth argues that an additional instruction, set forth in the margin,[7] given in the context of joint venture which properly set forth a knowledge element, supplied the needed correction and that, when viewed as a whole, the instructions did not mislead the jury. In some instances Massachusetts decisions have relied on correct instructions in other parts of the charge to fill some gaps, saying "[T]he law does not require repetition of the same thought at each turn." *Commonwealth* v. *McLeod*, 394 Mass. at 739. See, e.g., *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 610 (1987) (judge did not have to repeat the nexus between self-defense and the elements of murder which he had given in connection with murder in the first degree in his discussion of murder in the second degree); *Commonwealth* v. *Young*, 35 Mass. App. Ct. 427, 438-440 (1993) (judge did not need to discuss provocation in connection with second degree murder where he had discussed the issue in connection with volun-

---

[6]The judge added "subject to an instruction which I'll give you in a moment." It is not clear what that was, and, in any event, it did not bear on the issue of the defendant's knowledge. The instruction given appears to be in accord with law prior to *Catalina*, 407 Mass. at 785.

[7]"It is not necessary that the Commonwealth prove that the defendant under this theory struck any fatal blow, but the Commonwealth must show that the defendant and any other alleged participant joined together to administer a beating to the victim and that *they knew or they should have known that the victim would suffer grave injury or death*; and if it's done under the circumstances of this doctrine of joint venture, if the action is done with malice, then it's murder in the second degree. If there is no malice, then it may be manslaughter." (Emphasis supplied).

tary manslaughter), and cases cited. While this principle is helpful, we need not rely thereon. What is more significant in this case is that the omission of an instruction on the defendant's knowledge and the incorrect instruction that evidence of intoxication has no bearing on manslaughter did not create a substantial risk of a miscarriage of justice.

In this case, knowledge on the part of the defendant of the relevant circumstances would have consisted of his awareness that he was kicking and punching Hubbard. The question is whether a correct instruction on the knowledge element of involuntary manslaughter and the absence of the incorrect instruction as to intoxication might have created reasonable doubt in the minds of the jurors that the defendant had knowledge of those circumstances. See *Commonwealth* v. *Souza*, 34 Mass. App. Ct. 436, 440-441 (1993).

The request that Camacho drive back to the scene and the comments of the defendant at that time strongly indicate awareness of the relevant circumstances. When they returned to the vicinity of the bar, the defendant told Camacho that Hubbard was "probably dead" and threatened to shoot Camacho if he told anyone. He boasted about how he had spread Hubbard's legs apart and kicked him in the groin. Although there was evidence that the defendant was "high" or drunk, Camacho testified that just prior to the attack, "They weren't on a level where I couldn't understand what they were talking about."

The evidence of drunkenness[8] was much less than in *Commonwealth* v. *Souza*, 34 Mass. at 441, or in *Commonwealth* v. *Messer*, 36 Mass. App. Ct. 708, 712 (1994), where we described the evidence of intoxication as "abundant." In each of those cases we emphasized that there was no evidence that the defendant's impairment precluded him from

---

[8]As indicated earlier, in his discussion with the police, the defendant had calculated the number of drinks he had had on the basis of the money he brought with him to the bar and stated he had taken Xanax tablets. A friend testified that the defendant was intoxicated. The bartender decided she would not serve the defendant any more because "I just felt that he had had enough. I mean, he was — seemed to be getting out of hand, I think, as far as being loud."

having the requisite knowledge. See *Souza, supra* at 443; *Messer, supra.* We also found it significant that, as in this case, there was no evidence from an expert that the defendant's condition prevented him from having the knowledge required. Compare *Commonwealth* v. *Sama,* 411 Mass. at 298-299, and *Commonwealth* v. *McLean,* 32 Mass. App. Ct. 978 (1992) (the facts taken from the record of the case are discussed in *Souza,* at 442), both cases in which the evidence of incapacity due to intoxication was far greater and where the defendants requested a correct instruction.

Although we find it troublesome that the judge erred not only with respect to the relevance of intoxication but also failed to inform the jury as to the requirement of knowledge, we think the defendant's actions and comments amply support the conclusion that he had the requisite knowledge, cf. *Commonwealth* v. *Sires,* 413 Mass. at 300, and that correct instructions as to knowledge would not have made a difference.

3. *Instruction as to causation.* Citing *Commonwealth* v. *Rhoades,* 379 Mass. 810, 824 (1980), the defendant points to a single comment made in connection with the judge's joint venture instruction — "up until the present moment, I have been instructing you on the law as it pertains to the alleged conduct of the defendant alone, for anything he did as an individual that may have caused or contributed to the victim's death . . . ." This comment could not have misled the jury, as the instructions taken as a whole made it clear that the defendant's actions had to be a proximate cause of Hubbard's death. See the instructions quoted in the text at 556-557, *supra,* and notes 7 and 3, *supra.*

4. *Instruction as to consciousness of guilt.* The defendant, as indicated earlier, made false statements to the police.[9] Defense counsel informed the judge that he did not want a consciousness of guilt instruction. In *Commonwealth* v. *Cruz,* 416 Mass. 27, 33 (1993), the court stated that if the defend-

---

[9] "False statements to the police are standard examples of admissible evidence of consciousness of guilt." *Commonwealth* v. *Cruz,* 416 Mass. 27, 29 (1993).

Commonwealth *v.* Flynn.

ant does not wish an instruction as required by *Commonwealth* v. *Toney*, 385 Mass. 575, 584-586 & n.6 (1982), and counsel so advises the court, the judge should exercise discretion as to whether to grant the request. There was here no abuse of discretion. That the prosecutor discussed the defendant's statements did not require the judge to give the instruction.

The remaining claims of the defendant, including the challenge to the prosecutor's closing, were either not objected to or are without merit. Those not objected to did not create a substantial risk of a miscarriage of justice.

*Judgment affirmed.*