## COMMONWEALTH *vs.* CHARLES M. FLYNN.

Bristol. May 3, 1995. - July 21, 1995.

Present: LIACOS, C.J., LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal*, Reasonable doubt, Required finding. *Homicide.*

Evidence at the trial of an indictment for murder in the second degree was
not sufficient on which to base a verdict of guilty of murder or man-
slaughter on a theory of individual liability, and the defendant's motion
for a required finding of not guilty on that theory of prosecution should
have been allowed. [814-818]

Where a defendant was convicted of manslaughter and it could not be
determined whether the conviction was premised on a theory of individ-
ual liability or joint venture, and where the theory of individual liability
was unsupportable by the evidence, the matter was remanded for a new
trial on the theory of joint venture only. [818-819]

INDICTMENT found and returned in the Superior Court De-
partment on July 12, 1990.

The case was tried before *William H. Carey*, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Jane Larmon White* for the defendant.

*Mary O'Neil*, Special Assistant District Attorney, for the
Commonwealth.

O'CONNOR, J. Charles M. Flynn was indicted for the mur-
der in the second degree of Wayne Hubbard. A jury trial
followed. The Commonwealth's theories were that Flynn had
caused the death of the victim both individually and as a
joint venturer with one Timothy Davis.[1] At the conclusion of
the Commonwealth's case, and at the conclusion of all the
evidence, Flynn moved for a required finding of not guilty on

---

[1]Davis had previously pleaded guilty to manslaughter.

the theory of individual liability. The judge denied the motions. The jury found Flynn guilty of manslaughter. The verdict did not specify whether the jury found the defendant guilty individually or as a joint venturer. Flynn was sentenced to a term of from fifteen to twenty years' imprisonment at the Massachusetts Correctional Institution at Cedar Junction.

The Appeals Court affirmed the conviction. *Commonwealth* v. *Flynn*, 37 Mass. App. Ct. 550 (1994). We granted Flynn's application for further appellate review. In this appeal, Flynn argues that he was entitled to a required finding of not guilty on the theory of individual liability, because there was insufficient evidence to warrant finding beyond a reasonable doubt that his own actions caused or contributed to cause Hubbard's death. Flynn also challenges the jury instructions in several respects. Finally, he claims that the prosecutor's closing argument prejudiced his right to a fair trial and deprived him of due process. We conclude that a required finding of not guilty on the theory of individual liability should have been ordered. Because it was not ordered, and because it is impossible to tell on what ground the jury made their decision, we vacate the judgment and remand the case for a new trial on the theory of joint venture only. In view of this conclusion, it is unnecessary for us to consider the other issues raised by the defendant.

We summarize the evidence. At 2 A.M. on June 29, 1990, Wayne Hubbard was found lying in a parking lot across the street from a bar known as "Bev's Place" in New Bedford. He was pronounced dead at 2:53 A.M., after being transported to the hospital. Dr. William Zane, a forensic pathologist and medical examiner, performed an autopsy. He testified that the cause of death was a "subarachnoid hemorrhage at the base of the brain and swelling due to multiple blunt force injuries of the face and the head." Zane identified several sites of impact: to the top of Hubbard's head; to the left side of his upper and lower lips, including a broken molar tooth on the left side; to the bridge of his nose; to "the prominence of the forehead"; to the right forehead; behind the right ear;

and to the cheek, including a fractured right jaw. Dr. Zane could not say which impact caused the bleeding and brain swelling. He acknowledged, however, that even one blow could have killed Hubbard.

William Camacho, a Commonwealth witness, testified that he arrived at Bev's Place at 11 P.M. on June 28, 1990. While in the bar, Camacho observed Flynn try to stop Davis from attacking Hubbard. Camacho, who was five feet, seven inches tall, described Davis as being slightly taller, and Flynn as being shorter, than himself. Hubbard, on the other hand, was said to be a very large man, twice the size of Camacho. Camacho left the bar with Davis, promising to give him a ride home in exchange for some marihuana. After going outside, the two were joined by Flynn. As they entered the parking lot, Hubbard approached Davis and Flynn. Following some conversation which Camacho said he could not hear, either Davis or Flynn told Hubbard to get away and waved him toward Camacho. When Hubbard approached Camacho, Camacho told him to leave. Hubbard then went back over to Davis and Flynn, and, following a brief conversation among the three, Davis punched Hubbard in the face with his right fist. Hubbard fell to the ground, and thereafter Camacho did not see him move. Davis kept hitting Hubbard on his face with his hands while at the same time Flynn kicked him hard an estimated "six or seven" times. Camacho saw Flynn kick Hubbard in the chest, but "not in his head or his face." According to Camacho, the punching and kicking did not last "that long." Twice, Flynn told Davis, "Stop it. Let's go."

Afterward, according to Camacho's testimony, the two men still wanted a ride from Camacho. Flynn directed him as he drove. During the ride, Davis bragged about the extent of the beating he had delivered to Hubbard, and Flynn described how he had spread Hubbard's legs with his foot and kicked him in the groin. At one point, Flynn made Camacho return to the area near the bar, and as they drove by, Flynn said, "He's probably dead." Flynn said to Camacho, "It's be-

tween the three of us, and if you say anything, I'm going to shoot you in the back of the head."

The only other account of the incident came from the testimony of police officers concerning statements Flynn had made to them on June 30, July 1, and July 2, 1990. The testimony was that during the first discussion, Flynn said that he saw a scuffle occurring across the street when he left the bar, but he could not recall anything else about it and did not know the parties involved. He said that, later on, he was picked up on Purchase Street by a friend who dropped him off at his apartment. Although he told the police that he could not remember who had been involved in the scuffle, he suspected that Davis had something to do with it because Davis liked to hurt people when drinking, and because Davis had called Flynn on June 29, saying that he had awakened to find blood on his hands and asking if Flynn knew what had happened. Later that day, Davis came to Flynn's apartment to pick up some clothes, and Flynn saw that Davis's hands were "all messed up."

The second interview occurred on July 1. When he was asked how much he had had to drink on June 28, Flynn responded that he was not sure, but that he had had thirty dollars when he arrived at Bev's Place and no money the next morning. Based on that, Flynn estimated that he might have had sixteen or seventeen rum and cokes. He also had taken some prescription drugs, specifically five to eight Xanax pills. Again Flynn said that when he left the bar, he could recall that there was some kind of argument going on in the parking lot across the street, but he could not remember who had been involved. Later, Flynn said that he had been untruthful, and he knew that one person arguing was Davis and that Davis had punched the other person and knocked him to the ground. Davis had also hit the man several times with an object he took out of a car. The next day Davis came to Flynn's residence and informed him that the police wanted to talk to him (Davis) about a fight at the bar. Flynn told Davis "that he would like it if Davis didn't mention his name to the police."

Flynn spoke to the police again on July 2. He acknowledged that his previous statements were incomplete and that he knew more about the incident. He said that he had seen Davis arguing with Hubbard, and he joined the two of them in the parking lot across from Bev's Place. He stated that he (Flynn) had given Hubbard "a couple of shots to the face, meaning he struck the victim in the face," and that Hubbard, in turn, struck back at Flynn causing Flynn to fall down on the pavement. Davis then "really started whaling" on Hubbard, and later hit him with a pipe. After Davis had stopped hitting Hubbard, Flynn approached and kicked Hubbard once in the leg, "to see if he would move," but he did not.

The United States Constitution prohibits the criminal conviction of a person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1978). "[A]n appellate court reviewing the denial of a criminal defendant's motion for a directed verdict [required finding of not guilty] must adopt the following approach: '. . . [the] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' . . . Thus, to sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt." (Citation omitted.) *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

At the close of the Commonwealth's case, at the close of all the evidence, and many times during the charge conference, defense counsel argued that there was insufficient evidence on which to base a verdict of guilty of manslaughter (or murder, which is no longer an issue) on a theory of individual liability. We conclude that defense counsel was correct.

To convict a defendant of involuntary manslaughter on a theory of individual liability, the Commonwealth must prove that the defendant unintentionally caused another's death during the commission of wanton or reckless conduct or during the commission of a battery. In either event, the Commonwealth must prove that, in the circumstances, the defendant's conduct created a high degree of likelihood that substantial harm would result to the victim. *Commonwealth v. Sneed*, 413 Mass. 387, 393-394 & n.5 (1992). We conclude that, as a matter of law, the evidence in this case was insufficient to warrant the defendant's conviction on a theory of individual liability.

The only evidence of causation was that Hubbard's death had been caused by a "subarachnoid hemorrhage at the base of the brain and swelling due to multiple blunt force injuries of the face and head." All of the injuries which caused the swelling leading to death were to Hubbard's face or neck or head. The prosecution's evidence concerning the defendant's own batteries of Hubbard came from Camacho's testimony and from the testimony of police officers as to the defendant's three statements. On Camacho's version of events, Davis first punched Hubbard in the face, Hubbard immediately fell to the ground, and Hubbard never moved again, despite the continued punches rained upon his head and face by Davis as Hubbard lay on the ground. According to Camacho, after Hubbard had fallen to the ground and ceased moving, and contemporaneously with the continuing punches to the head administered by Davis, the defendant kicked Hubbard six or seven times, hard. No kick was to any area above Hubbard's chest, however.

If the jury accepted as true the version of events recounted by Camacho, the defendant never struck Hubbard on the face or neck or head. If the jury instead accepted as true the defendant's statements to the police, the defendant gave Hubbard "a couple of shots" to the face. This evidence was the most favorable to the Commonwealth. However, there was no evidence as to the amount of force with which those blows to the face were delivered, and there was no proof that

Hubbard was harmed by them. For all that appears, Hubbard was in good enough condition afterward to retaliate and knock the defendant down. The defendant's statements to the police would not have warranted a finding that the defendant's "shots" caused or contributed to cause Hubbard's death. Furthermore, the evidence would not have warranted a finding that the "shots" created a high degree of likelihood that substantial harm would result to Hubbard. See *Commonwealth* v. *Sneed, supra* at 394.

We agree with the Appeals Court's observation that "[w]here two assailants participate in a fatal beating, there would be a sufficient causal connection if both 'defendants' blows together caused [the victim's] death.' *Commonwealth* v. *McLeod,* 394 Mass. 727, 748, cert. denied [sub. nom. *Aiello* v. *Massachusetts*], 474 U.S. 919 (1985)." *Commonwealth* v. *Flynn, supra* at 554. We do not agree, however, that the jury would have been warranted in finding that Davis's and the defendant's blows together caused the victim's death, that is, that Flynn's blows added anything to Davis's conduct to produce the fatal result. The facts of this case are very different from the facts in *McLeod, supra.* In that case, as a result of an altercation between several police officer defendants, including John T. Macauda, and a group of civilians, one of the civilians sustained injuries and died. Macauda moved for a required finding of not guilty. His motion was denied and he appealed. This court affirmed the conviction.

We explained in *McLeod, supra* at 746-747, that an expert witness, called by the Commonwealth, had testified that the victim's death was

> "caused by 'one *or* multiple blunt force injuries to the head' (emphasis added). He was unable to determine which injuries caused death, nor was he able to determine whether a single injury caused death, or whether death was the cumulative result of all of the injuries. He simply stated, 'It could have been from one injury or multiple injuries.' From this testimony, it is impossible

to say whether Macauda's blows contributed to [the victim's] death or whether some especially severe blow occurred during the second entry that cut off the effects of all previous blows and was itself the sole cause of death. Standing alone, this testimony of the expert witness would be insufficient to forge the causal link between Macauda's acts and [the victim's] death."

We further reasoned:

"Of course, it would also be possible to conclude that the cumulative effect of all the blows was required for death. In that case, there clearly would be a sufficient causal connection between Macauda's actions and [the victim's] death. But when the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *McLeod, supra* at 747.

In *McLeod*, the expert witness's testimony, referred to above, was significantly augmented by other evidence. We stated:

"The Commonwealth's expert witness also testified that there had been four or five blows to the head *each* [emphasis in original] of which required the application of 'severe' force. There was also testimony that Macauda struck [the victim] once with a tire iron . . .; once with a black, hooked instrument or nunchaku . . .; 'three solid whacks on the head' with a nightstick . . .; as well as testimony that Macauda hit someone on the bed (where [the victim] was lying or sitting) an unspecified number of times with an unspecified object . . .. Furthermore, there was evidence that after the first entry, in which Macauda participated, [the victim] became unconscious and did not regain consciousness until after the second entry." *Id.* at 747.

"Given the testimony on the number and force of the blows required to kill [the victim], the eyewitness testimony that Macauda struck the victim, the types of weapons Macauda was alleged to have used, and the state of the victim after the attack in which Macauda participated," *id.* at 748,

we concluded that the evidence was sufficient to warrant a finding that Macauda's acts caused the victim's death. The *McLeod* case does not support a contention that the evidence in the present case was sufficient to warrant a finding that the defendant individually caused or contributed to cause Hubbard's death. The evidence in the present case left the defendant's guilt on an individual liability theory "to conjecture or surmise and ha[d] no solid foundation in established facts." *Commonwealth* v. *O'Brien,* 305 Mass. 393, 401 (1940). Given the subsequent beating administered by Davis alone, the inference that Davis's blows alone caused death was "at least as strong" as any inference that the defendant's "shots" either caused or contributed to Hubbard's death. *Commonwealth* v. *Funches,* 379 Mass. 283, 296 (1979). Thus, "a reasonable juror . . . could not overcome a reasonable doubt about" whether the defendant's own acts caused death. *Id.* See *Berry* v. *Commonwealth,* 393 Mass. 793, 795 (1985); *Commonwealth* v. *Salemme,* 395 Mass. 594, 599 (1985).

In the instant case, the jury verdict did not specify whether the conviction of manslaughter was premised on a theory of individual liability or on joint venture. Because a verdict of guilty of manslaughter was legally unsupportable on a theory of individual liability and we cannot tell whether the jury adopted this theory, we reverse the conviction and set aside the verdict. *Commonwealth* v. *Matchett,* 386 Mass. 492, 511 (1982), citing *Yates* v. *United States,* 354 U.S. 298, 311-312 (1957), overruled on other grounds by *Burks* v. *United States,* 437 U.S. 1, 18 (1978) (verdict must be set aside where verdict supportable on one ground but not on another and impossible to tell which ground jury selected).

We remand this case to the Superior Court for a new trial on a theory of joint venture only.

*So ordered.*